[No. 28141-8-III.   Division Three.   December 16, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. SHELLY L. STARK, *Appellant*.

*David L. Donnan* and *Elaine L. Winters* (of *Washington Appellate Project*), for appellant.

*Steven J. Tucker, Prosecuting Attorney*, and *Mark E. Lindsey, Deputy*, for respondent.

¶1 BROWN, J. — Shelly L. Stark appeals her convictions for first degree premeditated murder and conspiracy to commit first degree murder in the shooting death of her estranged husband, Dale Stark. First, Ms. Stark contends the trial court erred in giving an aggressor instruction under the facts; we agree and do not reach her related evidence ruling contentions. Second, Ms. Stark contends the court erred in instructing on the conspiracy elements at variance with the information; we agree, but disagree with her that the evidence is insufficient for retrial. Accordingly, we reverse both convictions.

## FACTS

¶2 The Starks married in 1984 and initially lived happily in North Carolina. Then, Mr. Stark began encouraging Ms. Stark to seek employment at a massage parlor. When she refused, Mr. Stark yelled at her, threw items in the house, pushed Ms. Stark, and threw a chair at her back. On one occasion, he pushed her to the ground and put his knee on her throat until she passed out. When Ms. Stark came to, Mr. Stark took Ms. Stark to a massage parlor in an isolated

area, dragged her out of the car, instructed her to get a job, and drove off. The marriage changed after this incident.

¶3 Mr. Stark was considerably larger than Ms. Stark. Over the next 23 years, Ms. Stark experienced physical, verbal, mental, and sexual abuse by Mr. Stark. Mr. Stark eventually convinced Ms. Stark to work at a massage parlor. Later, Mr. Stark arranged for her to work as a topless dancer to "meet more clients," and then as a prostitute. Report of Proceedings (RP) at 610, 611.

¶4 Ms. Stark hid her employment in the sex industry from her family and friends. Mr. Stark used this information to manipulate and blackmail Ms. Stark. He referred to Ms. Stark as "the fucking bitch" and would beat her when she threatened to stop prostituting. RP at 620. He began gambling and used her prostitution money to pay gambling debts.

¶5 In 1990, the couple's son, Christopher,[1] was born. The family moved to Spokane. The police responded to multiple calls from the Starks' home due to domestic violence, but Mr. Stark was never convicted because Ms. Stark refused to testify against him. Ms. Stark's sister, Donna Haggerty, saw Mr. Stark hit Ms. Stark twice in the chest with his elbow and once noticed bruises on Ms. Stark's arms. After Christopher was born, Ms. Stark and her husband lost two second-trimester babies. Ms. Stark believed both babies died because of her husband's sexual abuse while she was pregnant.

¶6 Mr. Stark continued to gamble. In 2006, he faced severe financial problems and began using online sites to prostitute his wife. In September 2007, Ms. Stark stopped working as a prostitute. Christopher was now 17 years old. As a child, Christopher witnessed his parents' fights and tried to stay out of the "crossfire." RP at 481.

¶7 After discussing divorce, the Starks agreed concerning finances and child custody in September 2007. In the

---

[1] To not confuse the two Mr. Starks, Christopher will be referenced by his first name.

agreement, Mr. Stark was to have primary physical custody of Christopher, with Ms. Stark receiving five days of visitation per month; full ownership of the home; and a Honda Accord. Ms. Stark agreed to pay $750 per month in child support and $750 per month in spousal support. Ms. Stark remained the beneficiary of Mr. Stark's $400,000 life insurance policy. Ms. Stark felt the agreement was unfair but she was desperate to obtain a divorce. She then moved to California.

¶8 Eventually, Ms. Stark decided to find an attorney and revise the marital settlement and custody arrangement. Ms. Stark decided to tell her family about her sex industry background so Mr. Stark could no longer blackmail her.

¶9 Ms. Stark returned to Spokane and obtained a temporary restraining order on December 7, 2007. The order prevented Mr. Stark from contacting Ms. Stark and Christopher, and gave Ms. Stark the right to occupy the family home and use the Honda until the next hearing on December 20, 2007. Ms. Stark asked her other sister, Karen Jachetta, to come to Spokane from Idaho to help her serve the order. Mr. Stark was then out of town but was expected to return the next morning. Ms. Jachetta's car struck a bull moose on her way to Spokane, where she was hospitalized. Ms. Jachetta had brought a handgun belonging to their mother, Denise Johnson, and a shotgun belonging to her son, Dale Johnson, for protection. Mr. Johnson picked up the guns on his way to the hospital where he gave them to Ms. Stark. Ms. Stark asked Mr. Johnson to serve Mr. Stark with the temporary restraining order.

¶10 Ms. Stark, Mr. Johnson, and Christopher returned to the family home. At around 2:00 a.m., Mr. Stark unexpectedly returned home, entering the living room and greeting Mr. Johnson and Christopher. Ms. Stark retreated to the kitchen. Her purse, which contained the handgun, was on the kitchen counter. Mr. Johnson tried to get Mr. Stark to go back outside. When he refused, Mr. Johnson served Mr. Stark with the temporary restraining order. Mr. Stark became angry, and turned toward the kitchen, making eye

contact with Ms. Stark. She saw his face turn bright red and "he looked at me as if he was going to kill me." RP at 724. Ms. Stark then yelled at Mr. Johnson and Christopher to leave. As the young men ran out the front door, Mr. Stark was heading toward the kitchen. The young men heard gunshots shortly after exiting the home.

¶11 Ms. Stark contends Mr. Stark charged directly at her, called her names, and threatened to kill her. He then looked at a knife on the counter. Ms. Stark believed he made a motion to get the knife. At that point, Ms. Stark fired the handgun. Mr. Stark continued to call her names as he slumped to the floor, and she continued to shoot the gun. She then left the house and called 911.

¶12 The State charged Ms. Stark with first degree murder and conspiracy to commit first degree murder. The amended information states Ms. Stark "conspired with Karen Jac[h]etta and Denise Johnson." Clerk's Papers (CP) at 54. Ms. Stark argued self-defense.

¶13 During trial, Dr. Lenore E. Walker, a psychologist and expert on the psychological impact of domestic violence on women, testified that Ms. Stark suffered from battered women's syndrome. She further testified women suffering from battered women's syndrome are quick and accurate in perceiving danger from the batterer, in part, due to subtle clues called "trauma triggers." These triggers increase the woman's fear level. Dr. Walker explained that Ms. Stark developed "learned helplessness" and "the only way she could protect herself and Christopher was to have something that was as strong as a gun." RP at 847. Ms. Stark also testified in her defense. The court permitted her to testify to prior abuse, but not to Mr. Stark's statements during the abuse or his statements on the night of the shooting.

¶14 Over Ms. Stark's objection, the court instructed the jury, "No person may, by any intentional act reasonably likely to provoke a belligerent response create a necessity for acting in self defense . . . and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's

acts and conduct provoked or commenced the fight, then self defense . . . is not available as a defense." CP at 108. Without objection, the court instructed that to convict Ms. Stark of conspiracy, it must find "the defendant agreed with one or more persons to engage in or cause the performance of conduct constituting the crime of murder in the first degree." CP at 99. The jury found Ms. Stark guilty as charged. She appealed.

## ANALYSIS

### A. Aggressor Instruction

¶15 The issue is whether the trial court erred in giving the aggressor instruction.

¶16 We review de novo whether sufficient evidence justifies an aggressor instruction. *State v. Anderson*, 144 Wn. App. 85, 89, 180 P.3d 885 (2008) (citing *State v. J-R Distribs., Inc.*, 82 Wn.2d 584, 590, 512 P.2d 1049 (1973)). The State needs to produce some evidence showing Ms. Stark was the aggressor to meet its burden of production. *State v. Riley*, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999). "A court properly submits an aggressor instruction where (1) the jury can reasonably determine from the evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon." *Anderson*, 144 Wn. App. at 89 (citing *Riley*, 137 Wn.2d at 909-10).

¶17 In *Riley*, Mr. Riley referred to a rival gang member as a " 'wanna-be.' " 137 Wn.2d at 906. The victim then threatened to shoot Mr. Riley. Mr. Riley pulled a gun on the victim and demanded his gun. As the victim reached for his gun, Mr. Riley shot him. The court instructed on first aggressor. *Id.* at 907. The jury found Mr. Riley guilty of first degree assault. He appealed his conviction, arguing the trial court erred in giving an aggressor instruction. The court rejected Riley's challenge, holding generally where

credible evidence exists from which a jury could reasonably determine that the defendant provoked the need to act in self-defense, an aggressor instruction is appropriate. *Id.* at 910. Significantly, while the evidence leading to the shooting was in conflict, Mr. Riley undisputedly pulled a gun on the victim first. *Id.* at 907.

¶18 Here, Ms. Stark was hiding in the kitchen. When Mr. Stark saw her, he charged at her, calling her names and threatening to kill her. Mr. Stark then saw a knife on the counter and made a move for the knife, Ms. Stark then shot the gun she brought for protection; these facts are distinguished from those in *Riley*. The State argues obtaining a restraining order is sufficient provocation, but our Supreme Court has held that spoken words are not sufficient; therefore, written words would likewise not be sufficient provocation for an aggressor instruction. *See Riley*, 137 Wn.2d at 911 ("we hold that words alone do not constitute sufficient provocation").

¶19 Because Ms. Stark did not provoke the fight (she was hiding in the kitchen), because no conflicting evidence is presented regarding Ms. Stark's conduct, and because the evidence does not show Ms. Stark made the first move (Mr. Stark charged, threatened to kill Ms. Stark, and reached for a knife), sufficient evidence does not exist to justify an aggressor instruction. *Anderson*, 144 Wn. App. at 89. Notably, Washington courts have noted few situations exist necessitating an aggressor instruction. *State v. Arthur*, 42 Wn. App. 120, 125 n.1, 708 P.2d 1230 (1985). This is because "[t]he theories of the case can be sufficiently argued and understood by the jury without such instruction." *Id.* Moreover, "[w]hile an aggressor instruction should be given where called for by the evidence, an aggressor instruction impacts a defendant's claim of self-defense, which the State has the burden of disproving beyond a reasonable doubt." *Riley*, 137 Wn.2d at 910 n.2.

¶20 Essentially, the court instructed if Ms. Stark was the first aggressor then self-defense was "not available as a defense." CP at 108. Thus, without supporting evidence

to justify giving the aggressor instruction, the court prevented Ms. Stark from fully asserting her self-defense theory. *Riley*, 137 Wn.2d at 910 n.2. The error is constitutional and cannot be deemed harmless unless it is harmless beyond a reasonable doubt. *State v. Birnel*, 89 Wn. App. 459, 473, 949 P.2d 433 (1998). Given Ms. Stark was facially justified in obtaining the restraining order and having it served by a third person, Mr. Stark's unexpected arrival at the place of service, and Mr. Stark's violent response to the legal process, we cannot conclude the error was harmless beyond a reasonable doubt. The State was relieved of its burden to disprove self-defense, likely affecting the trial outcome. *See State v. Smith*, 131 Wn.2d 258, 265, 930 P.2d 917 (1997) ("[W]e cannot assume that the jury attempted to compensate for the court's [instructional] error . . . . [T]herefore, [we] cannot say that the error was harmless.").

¶21 In sum, the trial court erred in granting the aggressor instruction. Having so held, we must remand for a new trial and do not reach Ms. Stark's hearsay exclusion issue.

### B. Conspiracy

¶22 First, Ms. Stark contends the State failed to provide sufficient evidence to prove a plan existed to kill Mr. Stark.

¶23 We review evidence sufficiency challenges to determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980). When the evidence sufficiency is challenged in a criminal case, we draw all reasonable inferences in the State's favor and interpret them most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

¶24 The State must prove all crime elements beyond a reasonable doubt. *State v. McCullum*, 98 Wn.2d 484, 494, 656 P.2d 1064 (1983). A person is guilty of criminal conspiracy if, with the intent to commit a crime, he agrees with one or more persons to engage in or cause the performance of such conduct, and any member of the conspiracy takes a substantial step in pursuance of the agreement. RCW 9A.28.040(1).

¶25 The State must show an actual, rather than a feigned agreement with at least one other person to prove conspiracy. *State v. Pacheco*, 125 Wn.2d 150, 159, 882 P.2d 183 (1994). The State does not need to show a formal agreement. *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669 (1997). And, the conspiracy may be proved by the declarations, acts, and conduct of the parties, or by a concert of action. *Id.* This proof may be circumstantial. *State v. King*, 113 Wn. App. 243, 284, 54 P.3d 1218 (2002).

¶26 Additionally, Washington implicitly recognizes that the subject crime of the conspiracy is an element. *Smith*, 131 Wn.2d at 262-63. Here, the subject crime is first degree murder. Thus, the State must prove an agreement existed with premeditated intent to cause the death of another person. RCW 9A.32.030(1)(a). Here, the State proved Ms. Stark met with other individuals to obtain a handgun and a shotgun. Viewing the facts and the inferences from the facts as we must, we agree the State has presented circumstantial evidence of an alleged conspiracy.

¶27 Second, Ms. Stark contends the trial court erred in giving an insufficient to-convict jury instruction. When a defendant is specifically charged with conspiring with a named codefendant, he or she cannot be convicted of conspiring with some other person or with some unnamed coconspirator. *State v. Valladares*, 99 Wn.2d 663, 671, 664 P.2d 508 (1983). Here, the to-convict instruction failed to name the specific conspirators as alleged in the information. *See State v. Brown*, 45 Wn. App. 571, 577, 726 P.2d 60 (1986) (advising trial courts in the future to instruct juries that

they may convict only if it finds that the defendant conspired with one or more persons named in the information if the State specifically names coconspirators in the information). This discrepancy should be addressed on remand.

¶28 Reversed.

SWEENEY and SIDDOWAY, JJ., concur.

Review denied at 171 Wn.2d 1017 (2011).