IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 34157-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JOSEPH ANDREW RICHMOND, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, A.C.J. — Joseph Richmond appeals his conviction and sentence for second degree murder. We affirm the conviction but remand for resentencing so that the trial court may assess whether an out-of-state conviction should be included in Mr. Richmond's offender score.

BACKGROUND

*Offense conduct*

Dennis Higginbotham went to Joseph Richmond's property with two other individuals, Veronica Dresp and Lonnie Zackuse. Ms. Dresp was Mr. Richmond's

estranged girlfriend.  Ms. Dresp had asked Mr. Higginbotham and Ms. Zackuse to accompany her to Mr. Richmond's property so that she could remove some of her belongings.[1]

When the trio arrived at Mr. Richmond's home, Ms. Dresp knocked on the door. Although there was no answer, Ms. Dresp could see Mr. Richmond inside.  Ms. Dresp felt angry.  She wanted to retrieve her belongings.  Ms. Dresp advised Mr. Richmond that if he did not open the door, she would kick it down.  She also told him she would break into the shed.  To that end, she retrieved a crow bar from Mr. Higginbotham's van.[2] As Ms. Dresp followed through on her promise to break into the shed, a police officer arrived at the scene in response to a call from Mr. Richmond.

The officer talked to Ms. Dresp and Mr. Richmond.  It appears this helped mitigate the situation.  With the officer's input, it was agreed Ms. Dresp would return the following day to retrieve her belongings from inside the residence.  It was also agreed Ms. Dresp could immediately remove some belongings from a car parked on the property.

[1] Ms. Dresp had lived at the property with Mr. Richmond as an authorized tenant. The parties dispute whether Ms. Dresp shared Mr. Richmond's authority over the premises on the date of the offense conduct.  We need not resolve this issue for purposes of this appeal.

[2] Ms. Dresp testified that she was using Mr. Higginbotham's van because it was the only available vehicle and it could also fit her belongings.

With a plan for the removal of Ms. Dresp's property in place, the officer left, believing she had resolved the situation to the best of her ability.[3]

Once the officer was gone, Ms. Dresp began removing items from the car with the help of Mr. Higginbotham and Ms. Zuckuse. Mr. Higginbotham's presence appeared to upset Mr. Richmond. Mr. Richmond began yelling and an oral argument ensued between the two men. Although he was much smaller than Mr. Richmond, Mr. Higginbotham stated he was not afraid of Mr. Richmond. He said he was at the property only to help Ms. Dresp retrieve her belongings. Mr. Higginbotham was carrying a flashlight in his hand at this point in time. According to Ms. Dresp and Ms. Zackuse, Mr. Higginbotham appeared more frustrated than angry.

Mr. Higginbotham started walking toward Mr. Richmond as the two men argued. However, Ms. Dresp urged Mr. Higginbotham away. Mr. Higginbotham and Mr. Richmond exchanged additional words and then Mr. Richmond went inside his house.

Mr. Richmond's return to the house was a relief. It appeared the hostility had come to an end. Unfortunately, this turned out not to be true. Instead, Mr. Richmond

---

[3] There was some dispute in the testimony as to when it was agreed that Ms. Dresp could remove items from the car. Ms. Dresp and Mr. Richmond recalled the agreement occurred after the officer left. The officer testified the agreement took place in her presence.

3

ran out of his house, armed with a two-by-four piece of lumber that was nearly four feet in length. Mr. Richmond and Mr. Higginbotham then started exchanging more words. Mr. Richmond warned Mr. Higginbotham not to come any closer to him. When Mr. Higginbotham took a step forward, Mr. Richmond struck Mr. Higginbotham with the two-by-four. According to Ms. Dresp and Ms. Zackuse, Mr. Richmond held the two-by-four like a baseball bat and swung it at Mr. Higginbotham's head. After he was hit, Mr. Higginbotham spun around and fell face first on the ground.

Ms. Dresp went to Mr. Higginbotham's aide and Ms. Zackuse called 911. Meanwhile, Mr. Richmond ran out of the back of his house and drove away in a truck. As he left, Mr. Richmond threatened to shoot everyone if they did not leave the property.

When emergency personnel arrived at the scene, it was determined Mr. Higginbotham had suffered "severe head trauma." 3 Report of Proceedings (RP) (Feb. 4, 2016) at 513. Mr. Higginbotham was unconscious and eventually transported to Harborview Medical Center in Seattle. He died shortly thereafter. Examiners found no evidence of any weapons on Mr. Higginbotham's body or in his clothing. An autopsy concluded Mr. Higginbotham's death was caused by a blunt force injury to his head.

*Legal proceedings*

Mr. Richmond lodged a self-defense theory against the State's murder charges. In

4

support of this theory, Mr. Richmond sought to introduce testimony from several experts. One of the experts was David Predmore. Mr. Predmore was proffered to testify about the general effects of methamphetamine consumption on human behavior. According to the defense, this testimony was relevant because high levels of methamphetamine had been found in Mr. Higginbotham's system at the time of his death. Although Mr. Richmond had not been aware of Mr. Higginbotham's methamphetamine consumption at the time of the assault, the defense theorized that Mr. Predmore's testimony was relevant to corroborate Mr. Richmond's claim that Mr. Higginbotham was behaving aggressively the night of the attack. The trial court excluded Mr. Predmore's testimony as speculative and irrelevant.

Another proposed defense expert was Dr. Robert Stanulis. Defense counsel advised that Dr. Stanulis would testify to the "flight or fight" response as it pertained to Mr. Richmond's behavior the night of the attack. Clerk's Papers (CP) at 168. Although defense counsel furnished a curriculum vitae for Dr. Stanulis, no expert report or summary of opinion was ever produced. None exists in the record on appeal. The trial court excluded Dr. Stanulis's testimony on the basis of an inadequate discovery disclosure.

At trial, Mr. Richmond took the stand and testified in his defense. Mr. Richmond told the jury he was in fear for his life on the night of the attack. He felt ganged up on by Ms. Dresp and her companions. He repeatedly told the trio they needed to leave. Mr. Richmond said that while he was trying to get Ms. Dresp and her companions to leave, Mr. Higginbotham approached him in a "fast manner," armed with a flashlight.[4] 5 RP (Feb. 9, 2016) at 993. Mr. Richmond then saw his dog try to sneak outside the door of his home. Mr. Richmond moved to shut the door and then returned to his position in front of Mr. Higginbotham. Another argument ensued. During this argument, Mr. Richmond claimed Mr. Higginbotham approached him with what appeared to be a knife. Mr. Richmond felt scared. He picked up a two-by-four and used it to strike down Mr. Higginbotham. After Mr. Higginbotham fell, Mr. Richmond stated he panicked. He ran inside his house, grabbed his dog, and left the property in a truck.

Based on the testimony, the trial court provided the jury a full panoply of self-defense pattern instructions. Not only did the court provide WPIC 16.02, 16.07, and 16.08 (regarding justifiable homicide and no duty to retreat) as requested by Mr. Richmond, it also provided WPIC 16.04, as requested by the State, which explains the

---

[4] The flashlight was a "standard police type Maglite," approximately 15 inches in length. 5 RP (Feb 8, 2016) at 698, 895.

restrictions on lawful use of self-defense by an initial aggressor.[5]

During summation, the prosecutor argued the initial aggressor instruction. The prosecutor asked the jury to focus on what happened when Mr. Richmond returned from his house after the initial verbal confrontation with Mr. Higginbotham. The prosecutor described Mr. Richmond's retreat inside the house as "a moment of peace." 6 RP (Feb. 9, 2016) at 1125. The prosecutor asked the jury to focus on this moment and consider whether Mr. Richmond's subsequent actions were reasonable. The prosecutor argued it was not reasonable for Mr. Richmond to come out of his house with the two-by-four given that the situation appeared to have calmed down. "Who's the aggressor?" the prosecutor asked. *Id*. at 1126. "The defendant is the aggressor. He doesn't get—You don't even get to the question of self-defense." *Id*. In her final statements to the jury, the prosecutor argued Mr. Richmond stirred the "whole thing up" and took "it to a next level by coming out of his house, armed with a board, screaming at them. He doesn't get to claim self-defense." *Id*. at 1165.

A jury convicted Mr. Richmond of second degree murder.

---

[5] The jury was provided instructions based on: (1) WPIC 16.02, Justifiable Homicide—Defense of Self and Others, (2) WPIC 16.04, Aggressor—Defense of Self, (3) WPIC 16.07, Justifiable Homicide—Actual Danger Not Necessary, and (4) WPIC 16.08, No Duty to Retreat. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02, 16.04, 16.07, 16.08 (3d ed. 2008) (WPIC).

At sentencing, the State introduced a proposed judgment and sentence that contemplated an offender score of five based, in part, on a 2004 Idaho conviction. The court engaged counsel in a brief colloquy regarding the nature of the Idaho conviction. The discussion focused on whether the conviction qualified as a violent offense. Defense counsel said the offense was a nonviolent felony and likely would not even qualify as a crime in Washington. The prosecutor and defense counsel agreed the Idaho offense should be included in Mr. Richmond's offender score as a nonviolent offense. Mr. Richmond concurred with this assessment.

At the conclusion of the sentencing hearing, the court imposed a standard range sentence. Mr. Richmond appeals.

## ANALYSIS

*Constitutional right to present a defense—exclusion of expert testimony*

Mr. Richmond argues the trial court violated his constitutional right to present a defense by excluding expert testimony. We disagree. The trial court never prevented Mr. Richmond from testifying or proffering a self-defense case to the jury. Instead, the court excluded expert testimony proffered by Mr. Richmond because it failed to meet the criteria for admissibility under the rules of evidence. This determination was well within

the trial court's discretion.  *See State v. Asaeli*, 150 Wn. App. 543, 573, 208 P.3d 1136 (2009) (evidentiary rulings reviewed for abuse of discretion).

Evidence Rule 702 governs the admissibility of expert testimony.  Under this rule, a witness may provide expert opinion testimony to the jury if (1) the witness is qualified as an expert, and (2) the witness's testimony would help the trier of fact.  *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004).  "Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury."  *Id.*  A proposed expert's testimony is not helpful or relevant if it is based on speculation.  *State v. Lewis*, 141 Wn. App. 367, 388-89, 166 P.3d 786 (2007); *State v. Mee Hui Kim*, 134 Wn. App. 27, 41-43, 139 P.3d 354 (2006).

The trial court properly excluded Mr. Predmore's proposed testimony regarding the effects of methamphetamine because it was not shown to be potentially helpful to the jury.  Mr. Predmore had never met or examined Mr. Higginbotham.  He had no basis to assess how Mr. Higginbotham's body may have processed methamphetamine.  According to Mr. Predmore's proposed testimony, methamphetamine can have a wide range of effects.  Increased aggression is only one possibility.  It is therefore nothing but speculation to connect Mr. Higginbotham's methamphetamine use with Mr. Richmond's claim of victim aggression.  The evidence was properly excluded, consistent with long-

9

standing case law. *Lewis*, 141 Wn. App. at 389 (expert testimony regarding potential

effects of methamphetamine too speculative to help jury decide whether the defendant

acted in self-defense).[6]

A somewhat similar analysis holds true for Dr. Stanulis. The defense failed to

proffer the substance of Dr. Stanulis's testimony to opposing counsel and the court in a

timely manner, despite numerous continuances. Although some sort of proffer was

eventually made to the trial court on the morning of jury selection, the substance of this

proffer is not in the appellate record. Without the ability to review the substance of the

proffer and how it might have related to Mr. Richmond's conduct the night of the attack,

we are in no position to analyze whether Dr. Stanulis's testimony was admissible or

whether Mr. Richmond was prejudiced by the trial court's decision to exclude the

testimony as a discovery violation.

*First aggressor jury instruction*

Mr. Richmond argues the trial court improperly issued a first aggressor instruction,

thereby vitiating his ability to argue self-defense. We disagree.

---

[6] Because Mr. Richmond was not aware of Mr. Higginbotham's drug use at the time of the altercation, the trial court also acted within its discretion in ruling that evidence of Mr. Higginbotham's drug use was irrelevant and inadmissible, irregardless of expert testimony.

A first aggressor instruction may be issued in circumstances where "(1) the jury can reasonably determine from the evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon." *State v. Anderson*, 144 Wn. App. 85, 89, 180 P.3d 885 (2008). The State is invariably the party to propose a first aggressor instruction. As such, the State has the burden of establishing the instruction's applicability. To meet this obligation, the State must point to some evidence, beyond the defendant's mere words, indicating the defendant intentionally provoked the confrontation between himself and the victim. *State v. Riley*, 137 Wn.2d 904, 910-11, 976 P.2d 624 (1999); *State v. Stark*, 158 Wn. App. 952, 960, 244 P.3d 433 (2010); *Anderson*, 144 Wn. App. at 89.[7]

As emphasized in the prosecutor's summation, the analysis of whether Mr. Richmond qualified as a first aggressor must focus on what happened after the "moment of peace," when Mr. Richmond returned from inside his home. 6 RP (Feb. 9, 2016) at 1125; *see State v. Wingate*, 155 Wn.2d 817, 823, 122 P.3d 908 (2005). There is a conflict in the parties' proffered evidence as to what happened at this point. According to the

---

[7] We review the evidence supporting a first aggressor instruction in the light most favorable to the State. *State v. Wingate*, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005).

11

State's witnesses, Mr. Richmond armed himself with a two-by-four and ran outside his home. But according to Mr. Richmond, he merely stood on his porch and reached for the two-by-four after Mr. Higginbotham came at him with what appeared to be a knife. The conflicting evidence justified a first aggressor instruction under the second qualifying circumstance (a conflict in the evidence as to whether the defendant provoked the fight) as well as the third (defendant made the first move by drawing a weapon). *Anderson*, 144 Wn. App. at 89.

Mr. Richmond argues the first aggressor instruction was improper because there was no evidence he engaged in unlawful activity prior to responding to Mr. Higginbotham's fateful final step. This legal argument is inapposite. The Washington cases requiring an unlawful act for a first aggressor instruction are no longer good law. *Wingate*, 155 Wn.2d at 822. As the law currently stands, the requirement is only that the defendant's provoking conduct be intentional. *Id*. That standard has been met.

Mr. Richmond complains the trial court's first aggressor instruction was flawed. He claims the instruction permitted the jury to find unlawful aggression based on mere words. Mr. Richmond also complains the instruction permitted the jury to find he was a first aggressor even if Mr. Higginbotham's response to Mr. Richmond was unreasonable. We disagree with both these contentions.

12

The first aggressor instruction provided by the trial court was based on

WPIC 16.04. It stated:

> No person may, by any intentional *act* reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill, use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

CP at 106 (emphasis added).

As written, the trial court's instruction only permitted the jury to find Mr.

Richmond an initial aggressor based on an "act." *Riley*, 137 Wn.2d at 913-14. Mere

words were insufficient. *Id.* In addition, the requirement that Mr. Richmond's act be

"reasonably likely to provoke a belligerent response," CP at 106, was sufficient to stop

the jury from reaching an initial aggressor conclusion based on an irrational victim

response.

In the end, the trial court's jury instructions did not strip Mr. Richmond of the

ability to claim self-defense. The court's instructions were not limited to the first

aggressor instruction. They also contained Mr. Richmond's proposed self-defense

instructions, including an instruction advising the jury that Mr. Richmond had the right to

stand his ground and defend himself from attack. As written, the court's instructions

empowered the jury to make an appropriate legal determination regarding self-defense,

based on the testimony the jurors found most persuasive. Had the jury believed the facts

proffered by Mr. Richmond in support of self-defense, the first aggressor instruction

would not have relieved the State of its burden of proof or negated the self-defense claim.

*See Stark*, 158 Wn. App. at 960-61; *State v. Douglas*, 128 Wn. App. 555, 563, 116 P.3d

1012 (2005). Even under the applicable de novo standard of review, *Stark*, 158 Wn. App.

at 959, the instruction was proper.

*Confrontation right and constitutional right to present a defense*

Mr. Richmond claims the trial court improperly restricted his ability to question

Ms. Dresp and Ms. Zackuse about their drug use on the day of the attack. This claim is

unsupported by the record. The trial court stated it had "no problem" with the defense

asking witnesses about their methamphetamine use on the day of the offense. 1 RP

(Jan. 27, 2016) at 174. Such questioning was relevant to the witnesses' credibility. The

lack of questions regarding drug use was the result of defense counsel's choice not to

engage in this line of inquiry, not any ruling by the trial court. We will not review this

strategic decision on appeal.

Mr. Richmond also complains he was not allowed to introduce testimony that Ms.

Dresp and Ms. Zackuse had used methamphetamine with Mr. Higginbotham on the day of

the offense. According to Mr. Richmond, this evidence was relevant to show the

14

witnesses' relationship to Mr. Higginbotham and their bias toward him. We find no

abuse of discretion in the trial court's ruling. Evidence of Mr. Higginbotham's

methamphetamine use had the potential of being improperly analyzed as bad character

evidence. This potential for prejudice was not offset by any significant probative value.

The jury knew Ms. Dresp and Ms. Zackuse were close friends with Mr. Higginbotham.[8]

Evidence of the trio's shared drug use would not have appreciably enhanced the jury's

ability to assess potential bias. The trial court acted within its discretion under ER 404(b)

and ER 403 in excluding the evidence. *State v. Darden*, 145 Wn.2d 612, 621-22, 41 P.3d

1189 (2002) (citing *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)).

*Out-of-state conviction and offender score*

Mr. Richmond argues his Idaho conviction should not have been included in his

offender score. According to Mr. Richmond, inclusion of the Idaho conviction was

improper because the Idaho statute underlying his conviction is not comparable to any

Washington felony offense, as required by RCW 9.94A.525(3). The State suggests we

should decline review of this issue because Mr. Richmond affirmatively acknowledged

---

[8] Ms. Dresp described Mr. Higginbotham as "a good friend of mine." 2 RP (Feb. 3, 2016) at 261. Ms. Zackuse described Mr. Higginbotham as a friend she hung out with "almost every day." 3 RP (Feb. 3, 2016) at 429.

15

the comparability of his Idaho conviction during the sentencing hearing.[9]

The State bears the burden of proving the existence of prior convictions used to enhance a defendant's sentencing range. *State v. Mendoza*, 165 Wn.2d 913, 920, 205 P.3d 113 (2009). This burden must be met, regardless of whether a defendant lodges an objection during the sentencing process. *State v. Ford*, 137 Wn.2d 472, 482, 973 P.2d 452 (1999). It is only when a defendant affirmatively acknowledges the facts and information necessary to justify use of a prior conviction in his or her offender score that the State is relieved of presenting evidence documenting the existence of prior convictions. *State v. Hunley*, 175 Wn.2d 901, 912, 287 P.3d 584 (2012).

The record before us does not warrant finding an affirmative acknowledgement. Although defense counsel recognized Mr. Richmond had an Idaho felony conviction and ultimately accepted the State's offender score calculation, neither defense counsel nor Mr. Richmond ever affirmatively acknowledged that the Idaho conviction was legally comparable to a Washington offense. To the contrary, defense counsel specifically disputed the legal comparability of the Idaho conviction. It is unclear why, given defense counsel's position, the defense ultimately concurred with the State's offender score

---

[9] The State acknowledges that if this court has some concern about the legality of Mr. Richmond's offender score calculation, then remand may be an appropriate remedy. Resp't's Br. at 51.

16

calculation. But we need not resolve this conundrum. A defendant's mere agreement with the State's offender score calculation and admission of the existence of an out-of-state conviction is insufficient to constitute an affirmative acknowledgment that an out-of-state conviction meets the terms of the comparability analysis. *State v. Lucero*, 168 Wn.2d 785, 789, 230 P.3d 165 (2010). Under the circumstances here, the State was not relieved of its burden to prove the facts justifying inclusion of the Idaho conviction in Mr. Richmond's offender score.

The appellate record lacks sufficient information to resolve the question of whether Mr. Richmond's Idaho conviction should have been included in the offender score. We therefore remand for resentencing on this issue. *Ford*, 137 Wn.2d at 485-86.

## CONCLUSION

We affirm Mr. Richmond's conviction but remand to the trial court with instructions to conduct a comparability analysis and assessment of Mr. Richmond's offender score. Mr. Richmond's request to deny costs is granted.

_____
Pennell, A.C.J.

I CONCUR:

_____
Siddoway, J.

17

No. 34157-7-III

FEARING, J. (dissenting) — I disagree with the majority that sufficient facts supported a first aggressor jury instruction. Therefore, I dissent.

The majority writes, on page four, that Joseph Richmond "ran out of his house, armed with a two-by-four piece of lumber that was nearly four feet in length." The opinion contains other references to Richmond running from inside the residence to the outdoors with the two-by-four. From these principal facts, the majority concludes the evidence justified a first aggressor instruction. I disagree.

Joseph Richmond, Dennis Higginbotham, whose mouth Richmond silenced, and Veronica Dresp, Richmond's former girlfriend, witnessed the immediate events leading to Dennis Higginbotham's death. Dresp testified to Richmond's return outside his house with a board in his hand as follows:

> [T]he next thing I see Joe [Richmond] running—you know, he came back outside, and—they start—they were exchanging more words, and— Joe said, "If you come any closer," you know,—or, he said, "Don't come any closer. I'm warning you." And then—then—I mean, Dennis [Higginbotham] took one more step closer and that's when—when he hit him.

Report of Proceedings (RP) at 292.  Dresp later averred:

> Q  And you said Joe came running back out of the house.  Did he have anything in his hands at that point.
> A  He had something behind his hands—or, behind his back—kind of—I mean, I couldn't see it at first.  But—by the time I realized what was going on it was too late.
> Q  Okay.  What did Joe do?
> A  He—hit him.

RP at 293.

> On cross-examination, Veronica Dresp testified:

> A  He [Joseph Richmond] came out and—stepped off the porch, and—I mean, I couldn't see the board at first, because it was more behind his back, but then, you know,—then they started walking towards each other,—and—'cause, I mean—
> Q  So Dennis and Joe—
> A  He wasn't—
> Q  —were both walking towards each other.  Is that—
> A  Just like—they took like a foot or two—

RP at 381.  Veronica Dresp declared further:

> Q  And did you—and you—This morning you said you heard Joe say something to Dennis at this point.  —tell him—something about getting closer, "Don't come closer,"—
> A  He said, "Don't"—Yeah.  He said, "Don't—don't come any closer.  I'm warning you."
> Q  Okay.  And then what did Dennis do after Joe said that?
> A  I mean, he took a step closer.
> Q  And that's when—Dennis got struck with the board.
> A  Right.

RP at 381-82.

No. 34157-7-III
*State v. Richmond* (dissenting)

Jury instruction 20, the first aggressor instruction to which Higginbotham

objected, read:

> No person may, by any intentional act *reasonably likely to provoke a belligerent response*, create a necessity for acting in self-defense and thereupon kill, use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

Clerk's Papers (CP) at 106 (emphasis added). Nevertheless, we should consider the

evidence not only in light of the aggressor instruction, but a second instruction that

recognized Joseph Richmond's right to stand his ground. Jury instruction 19 informed

the jury that Joseph Richmond need not have retreated from Dennis Higginbotham. The

instruction declared:

> It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

CP at 105.

Washington decisions recognize that the first aggressor instruction may deprive an

accused of the ability to claim self-defense. *State v. Wasson*, 54 Wn. App. 156, 160, 772

P.2d 1039 (1989). Therefore, few situations warrant an aggressor instruction. *State v.*

*Arthur*, 42 Wn. App. 120, 125 n.1, 708 P.2d 1230 (1985); *State v. Wasson*, 54 Wn. App.

3

at 161.  The theories of the case can usually be sufficiently argued and understood by the jury without the instruction.  *State v. Arthur*, 42 Wn. App. 125 n.1.

The majority writes that the State need no longer show that the defendant engaged in an unlawful act in order to garner the first aggressor instruction.  I do not consider this principle important to our decision.  The State still must show a provoking act by the defendant other than the assault or murder itself.  The provoking act that justifies a first aggressor instruction must be one that a jury could reasonably assume would provoke a belligerent response by the victim.  *State v. Bea*, 162 Wn. App. 570, 577, 254 P.3d 948 (2011); *State v. Wasson*, 54 Wn. App. at 159.  Also, the trial court errs when it submits an aggressor instruction and the evidence shows that the defendant used words alone to provoke the fight.  *State v. Riley*, 137 Wn.2d 904, 910-11, 976 P.2d 624 (1999); *State v. Anderson*, 144 Wn. App. 85, 89, 180 P.3d 885 (2008).

The rule controlling our appeal is that the provoking act cannot be the actual assault in order to warrant the giving of the first aggressor instruction.  *State v. Kidd*, 57 Wn. App. 95, 100, 786 P.2d 847 (1990); *State v. Wasson*, 54 Wn. App. at 159; *State v. Brower*, 43 Wn. App. 893, 902, 721 P.2d 12 (1986).  Joseph Richmond performed no provoking act until the deadly assault.

As noted by the majority, a court properly submits an aggressor instruction when (1) the jury can reasonably determine from the evidence that the defendant provoked the

4

fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon. *State v. Riley*, 137 Wn.2d at 909-10; *State v. Anderson*, 144 Wn. App. at 89. I discern no difference between the first and second circumstances under which to render the instruction. The trial court commits error when delivering the first aggressor instruction when not supported by the evidence. *State v. Wasson*, 54 Wn. App. at 158-59 (1989).

This court must decide if sufficient evidence supported the first aggressor instruction. I agree with the majority that we must view the evidence in the light most favorable to the State. When reviewing a claim for the sufficiency of the evidence, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). When the defendant challenges the sufficiency of the evidence in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Nevertheless, when an inference is part of the prosecution's proof supporting an element of the crime, due process requires the presumed fact to flow more likely than not from proof of the basic fact. *State v. Hanna*, 123 Wn.2d 704, 710, 871 P.2d 135 (1994). Whether an inference meets the appropriate standard must be

5

determined on a case-by-case basis in light of the particular evidence presented to the jury in each case. *State v. Hanna,* 123 Wn.2d at 712. A mere scintilla of evidence does not rise to the level of sufficiency in order to support a conviction. *State v. Kirkpatrick*, 14 Wn. App. 212, 216, 540 P.2d 450 (1975). Instead, the State must present substantial evidence. *State v. Randecker*, 79 Wn.2d 512, 517, 487 P.2d 1295 (1971).

The testimony of Veronica Dresp, the sole independent witness, fails to support a conclusion or inference that Joseph Richmond provoked a reaction in Dennis Higginbotham that required Richmond to act in self-defense. None of the testimony states that Richmond ran toward Higginbotham in a threatening manner. If one reads the entirety of Dresp's trial testimony, one questions whether Richmond ran at all. The testimony suggests he walked out of the house. Dresp spoke figuratively when using the word "running" and then the State's attorney later employed the same verb when questioning. Dresp also testified that Richmond "came out and—stepped off the porch," language that does not connote "running." RP at 381. Dresp states Richmond and Higginbotham later stepped toward one another, testimony that confirms that at least Richmond did not run at Higginbotham. Even if we assume that Richmond ran out of the house, which we should do based on principles of review, the trial still lacked testimony that Richmond ran toward Higginbotham in a threatening manner.

6

No. 34157-7-III
*State v. Richmond* (dissenting)

We should consider additional evidence. Although Joseph Richmond owned the residence, I assume that Veronica Dresp held the right to enter the premises to retrieve her personal belongings. Still, Dresp used a crowbar to break and enter Richmond's shed. A police officer calmed the situation, but Richmond thereafter exchanged taunts with Dennis Higginbotham, who assisted Dresp in retrieving belongings from a vehicle. Richmond did not desire Higginbotham on his property. Higginbotham walked toward Richmond and the two volleyed further affronts. Richmond entered his house and returned with the two-by-four.

Richmond stepped from the back steps and then walked toward Higginbotham. The two exchanged more verbal assaults and Richmond told Higginbotham not to step further. The trial lacked evidence that Richmond raised the board in a threatening manner before Richmond stepped toward Higginbotham and slammed him with the board. According to Veronica Dresp, Richmond held the board behind his person until he attacked Higginbotham.

Assuming we believe Joseph Richmond's story he never threatened Dennis Higginbotham before Higginbotham approached him with a knife. Under this version of the facts, Richmond did not engage in provocation before he acted in self-defense. Assuming we believe the State's facts, Joseph Richmond attacked Higginbotham without any advance provocation, other than words and by walking toward Higginbotham before

7

Higginbotham walked toward Richmond. The duo exchanged hostile words, but did not fight. Richmond committed a unilateral assault.

The majority emphasizes that Joseph Richmond carried a board in his hand. Nevertheless, under the State's evidence, Dennis Higginbotham did not move to strike Richmond because of the board. The parties faced each other and stood still while Richmond held the board. Walking with a two-by-four in one's hand does not reasonably provoke a fight, when one stops short of the victim and warns the victim not to step forward. Higginbotham stood on Richmond's property and Richmond held the right to stand his ground and order Higginbotham to leave. The majority's holding conflicts with the right to stand one's ground as instructed by the trial court in jury instruction 19.

Assuming the majority considers the two-by-four to constitute a weapon, Richmond possessed the right to hold the board to defend himself in the event Higginbotham attacked him first. Even if Richmond bore a gun, the constitution would protect his conduct. U.S. CONST. amend. II; WASH. CONST. art. 1, § 24.

Because we determine the inferences we can draw from the evidence on a case-by-case basis and because of the esoteric nature of determining the sufficiency of the evidence, reviewing the facts of reported decisions assists in the resolution of this appeal. In *State v. Anderson*, 144 Wn. App. 85 (2008), this court affirmed the rendering of a first aggressor jury instruction. Testimony established that the defendant leaned over a victim

with his hands on the arms of the victim's chair and yelled in her face. Joseph Richmond did not get in Dennis Higginbotham's face, but rather stood back and told Higginbotham not to come closer.

In *State v. Riley*, 137 Wn.2d 904 (1999), the Supreme Court affirmed the delivery of a first aggressor instruction. The jury heard evidence that Riley drew his gun first and aimed it at a victim. The testimony showed that Joseph Richmond kept the board behind his back and did not raise the lumber until he fatally battered Dennis Higginbotham.

In *State v. Wingate*, 155 Wn.2d 817, 823, 122 P.3d 908 (2005), the Supreme Court again affirmed the rendering of a first aggressor jury instruction. Wingate drew a gun after a confrontation between his friend and another had ended. The drawing of the gun constituted the act of first aggression.

Washington courts, in other cases similar to the facts in Joseph Richmond's appeal, reversed convictions because the evidence failed to support a first aggressor instruction. In *State v. Wasson*, 54 Wn. App. 156 (1989), this court reversed Rodger Wasson's conviction of second degree assault. Wasson and his cousin Billy Bartlett quarreled in an alley outside Bartlett's apartment. Wasson entered his car and repeatedly revved the engine of the vehicle. Bartlett broke the driver's side window of the car. Wasson exited his car with a gun in hand, but Wasson did not assault Bartlett. The commotion attracted neighbor Thomas Reed, who exited the apartment complex and told

9

the other two men to quiet. Reed and Bartlett exchanged blows, and one blow from Reed

knocked Bartlett to the ground. Reed then walked toward Wasson. According to

Wasson, he concluded Reed had stabbed Bartlett. Also, Reed approached him and

informed him that Reed would attack him next. Wasson told Reed to stop and fired after

Reed continued to approach him. According to Reed, Reed uttered no threats to Wasson

after Reed fought Bartlett. Also, Reed did not strike Wasson.

In *State v. Wasson*, this court reversed Rodger Wasson's conviction because the

trial court rendered a first aggressor instruction without evidence to support the

instruction. This court emphasized the right of Wasson to stand his ground when Thomas

Reed walked toward him.

In *State v. Arthur*, 42 Wn. App. 120 (1985), this court reversed another conviction

for second degree assault because of the rendering of the first aggressor instruction. The

instruction indicated that the State must prove that the defendant performed an unlawful

act that created the necessity for self-defense, and this court held such an instruction void

for vagueness. Still the decision notes the absence of evidence to support the instruction

and announces the proposition that trial courts should rarely grant the instruction.

In *State v. Arthur*, William Arthur stabbed Terry Waterhouse. Waterhouse

testified he and friends visited in a parking lot, when a drunken and abusive Arthur

approached the group. When Arthur got "in his face," Waterhouse pushed Arthur to the

10

ground. *State v. Arthur*, 42 Wn. App. at 121. Waterhouse and his friends then went to a tavern. Waterhouse later returned to the same parking lot. Arthur also returned and pulled his vehicle into a space in the lot. Arthur abruptly pulled his automobile from the parking spot at high speed, hit a car in an adjoining space, and his car ended in a ditch. Waterhouse ambled to Arthur's vehicle to prevent Arthur from leaving the scene of an accident. When Waterhouse reached into Arthur's car, Arthur stabbed him. Arthur testified that he acted in self-defense because he feared Waterhouse would attack him. This reviewing court noted that the only possible provoking act committed by Arthur was the collision with the other vehicle, but that Arthur had withdrawn from the parking lot. Arthur performed no immediate act that provoked Waterhouse to respond with violence.

In *State v. Brower*, 43 Wn. App. 893 (1986), a jury convicted Ted Brower of second degree assault. Brower journeyed to Claudia Hoyt's apartment to retrieve his car. Brower feared Hoyt or her friends would be armed, so he brought his firearm to use as a last resort. Frederick Martin occupied Hoyt's residence when Brower arrived. Martin grew agitated with Brower. When Brower left the apartment and walked down stairs, Martin trailed Brower. Brower turned and stuck his revolver in Martin's stomach and told him to return to the apartment. This court reversed the conviction because of the lack of evidence to support the giving of a first aggressor instruction. Assuming Brower to be the first aggressor, the first aggression occurred when Brower assaulted Martin.

11

No. 34157-7-III
*State v. Richmond* (dissenting)

Although Brower armed himself before traveling to Hoyt's apartment, Brower possessed the right to carry the firearm. A broad reading of *Brower* champions the proposition that arming oneself does not constitute an act that reasonably provokes a belligerent response.

I would remand for a new trial because of the rendering of the first aggressor jury instruction. The jury may still reject Joseph Richmond's self-defense defense and find him guilty of second degree murder.

Fearing, J.

12