[No. 30984-0-II.   Division Two.   July 7, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. SAMUEL GLEN
DOUGLAS, *Appellant*.

*Manek R. Mistry* and *Jodi R. Backlund* (of *Backlund & Mistry*), for appellant.

*Jeremy R. Randolph, Prosecuting Attorney*, and *Brandy M. Andersson*, for respondent.

¶1 HUNT, J. — Samuel Douglas appeals his conviction for first degree manslaughter, with a firearm enhancement. He argues that the trial court erred by (1) giving a first-aggressor jury instruction, (2) failing to instruct the jury that a first-aggressor's right to self-defense can be revived, and (3) refusing to instruct the jury about justifiable homicide in resistance of a felony. Douglas further argues that his counsel was ineffective and that the prosecutor commit-

ted misconduct. He also filed a supplemental brief arguing that the jury instructions were deficient because they did not require a nexus between the defendant, the firearm, and the crime.

¶2 In his statement of additional grounds, Douglas asserts additional instances of prosecutorial misconduct and that the trial court erred by (1) allowing rebuttal testimony from witnesses who had been in the courtroom, despite the court's witness-exclusion ruling, (2) allowing the jurors to handle and to test the firearm, (3) failing to give additional jury instructions, (4) improperly sentencing him within the standard range, and (5) pressuring the jury to reach a verdict.

¶3 Holding that the trial court erred in giving the "first-aggressor" jury instruction and in refusing to give Douglas's proposed justifiable homicide instruction, we reverse.

## FACTS

### I. BACKGROUND

¶4 Samuel Douglas and his wife Jeanie own a small hunting cabin on two and one half acres of land. Everett Stockton, Douglas's good friend for nearly 20 years, owns the adjoining property. John McMahon lived with the Douglases rent-free temporarily, while he looked for work. He acted as the care-taker for the house and animals during the week while the Douglases stayed in Bothell to conduct business. According to Douglas, McMahon was instructed to sleep in the bunk house, not the cabin. But McMahon was allowed in the cabin to take a shower, to watch television, or to use the stove.

¶5 One afternoon, Douglas and Stockton began working on an addition to the house. Douglas, Stockton, Jeanie, and McMahon were all drinking alcohol that day. Later that afternoon, Jeanie ran into the back room and told Douglas that McMahon had thrown something at her. Douglas and

Stockton rushed out to find McMahon, but he had left in the rain, with no coat or shoes.

¶6 Later that evening, Stockton and McMahon drank more beer at Stockton's house. McMahon told Stockton that he had thrown a ceramic piece at the wood stove in the Douglases' cabin; McMahon also said he was depressed and suicidal. At the end of their chess game, Stockton walked McMahon back to the Douglases' house.

¶7 The Douglases were having an argument; Douglas asked Stockton and McMahon not to come into the cabin. McMahon, who was "rather drunk," pushed past Stockton, who remained standing in the doorway, and entered the cabin. McMahon went to the refrigerator, grabbed another beer, walked over to Douglas who was seated on the futon, and began yelling at Douglas about being inconsiderate, selfish, and self-centered. Douglas feared that if he got up off the bed, McMahon, who weighed almost 100 pounds more than Douglas, would knock him back down. Douglas told McMahon to "get the f*** out of my house."[1] But McMahon continued the "verbal abuse" for approximately 15 minutes and moved toward Jeanie, screaming at her too, "at the top of his lungs." Afraid that McMahon was going to get physical with Jeanie, Douglas stood up on the futon between the two of them and repeated, "Get the f*** out of my house."

¶8 Standing near Douglas's loaded shotgun leaning against the wall, McMahon screamed back at Douglas, "Don't tell me what to do. I'll kick your a**."[2] Douglas moved to place himself between McMahon and the shotgun. McMahon threw liquid at Douglas, getting him wet. Douglas reached behind, grabbed the shotgun, held it low in the carrying position, pointed at McMahon, and again told McMahon to get out. McMahon did not leave. Instead, he advanced toward Douglas, who was confined in a "small" space "right up against the television set and the bed,"

---

[1] Report of Proceedings (RP) (Aug. 11-12, 2003) at 39.

[2] RP (Aug. 13, 2003) at 88.

yelling, "You are going to pull a gun on me. You better shoot me, you S.O.B. or I'm going to kill you."[3]

¶9 Stockton ran over, got between them, facing McMahon, used his left forearm to stop McMahon's advance, and tried to persuade McMahon to go elsewhere to calm down. Douglas then turned away from McMahon, holding the gun by the upper stock, and started to put the gun down. Stockton made eye contact with McMahon, who nodded, leading Stockton to believe that McMahon had calmed down and that the two of them were going to leave. Stockton turned to lead McMahon out of the room.

¶10 McMahon then screamed, "Shoot me,"[4] and charged toward Douglas. Caught off-guard, Douglas swung back to face McMahon. The shotgun, which was still in his hand, went off. Douglas did not recall removing the safety, denied having pulled the trigger, and claimed it had discharged accidentally. There was no evidence to the contrary.

¶11 McMahon fell. Stockton tried to administer first aid while the Douglases called 911.

## II. Homicide Investigation

¶12 State Patrol Trooper Grant Giacomazzi and Lewis County Sheriff's Deputies Withey, Stull, and Michaels responded to the 911 dispatch. Shortly after they arrived, they pronounced McMahon dead.

¶13 Trooper Giacomazzi detained Douglas, who smelled of and appeared to be affected by alcohol. When Giacomazzi noticed that Stockton and Jeanie also smelled like alcohol, they admitted that everyone had been drinking that night.

¶14 Deputy Withey interviewed Douglas and recorded his statement. Douglas told Withey that McMahon had been yelling, throwing things around the room, and kicking some furniture. Douglas admitted that his gun discharged, but he claimed it was accidental. He was shocked to learn

---

[3] RP (Aug. 13, 2003) at 94, 91.

[4] RP (Aug. 11-12, 2003) at 41.

that McMahon had died. Officers took Douglas back inside the house, and he walked them through what had happened.

## III. Procedure

¶15 The State charged Douglas with second degree felony murder "and/or in the alternative" first degree manslaughter. The trial court entered findings of fact and conclusions of law, set aside the jury's guilty verdict, and granted Douglas's motion for a new trial, based on ineffective assistance of counsel.

¶16 The State filed a third amended information, charging Douglas with (1) second degree felony murder[5] predicated on the underlying felony second degree assault, Count I; (2) second degree murder with intent to cause death without premeditation;[6] and (3) first degree manslaughter,[7] recklessly causing McMahon's death. The State charged a firearm enhancement on each count. The trial court dismissed the two counts of second degree murder. The court dismissed Count I based on *Andress*[8] and Count II under the mandatory joinder rule.[9]

¶17 The case proceeded to trial on first degree manslaughter, with the firearm enhancement. Douglas's testimony was generally the same as his previous testimony. Douglas further testified that he has handled firearms since he was 14 years old because his family hunted birds and big game, he has had extensive experience with shotguns, and he received military firearms training where he was taught that "you don't aim a gun at something you don't intend to

---

[5] A violation of RCW 9A.32.050(1)(b).

[6] A violation of RCW 9A.32.050(1)(a).

[7] A violation of RCW 9A.32.060(1)(a).

[8] *In re Pers. Restraint of Andress*, 147 Wn.2d 602, 616, 56 P.3d 981 (2002). In *Andress*, the Supreme Court held that felony murder cannot be predicated on an assault that culminates in murder.

[9] CrR 4.3.1(b)(3).

shoot."[10] Defense witness K.M. Sweeney, a forensic scientist, testified that if a firearm is cocked, loaded, the safety is off, and a person has his finger on the trigger and then moves rapidly, the weight of that movement against the trigger finger can cause the gun to discharge.

¶18 The trial court rejected Douglas's proposed jury instruction on justifiable homicide because it believed the evidence did not support that McMahon had committed residential burglary. Instead, over Douglas's objection, the trial court gave the State's requested "first-aggressor" instruction.

¶19 The jury convicted Douglas of first degree manslaughter, while possessing a firearm. The trial court sentenced Douglas, within the standard range, to 12 years confinement.

¶20 Douglas appeals.[11]

## ANALYSIS

### I. SELF DEFENSE JURY INSTRUCTIONS

#### A. Standard of Review

¶21 Generally, we review a trial court's choice of jury instructions for abuse of discretion.[12] A trial court may give jury instructions only when there is substantial evidence to support them.[13] In evaluating whether the evidence is substantial enough to support a defendant's proposed instruction, the trial court must interpret it most

---

[10] RP (Aug. 13, 2003) at 101.

[11] The State's failure to file its brief and to respond to our court clerk's communications in a timely fashion precluded its ability to file a brief and to present oral argument. Counsel for the State was present during oral argument and available to answer the court's questions, if any.

[12] *Tennant v. Roys*, 44 Wn. App. 305, 309, 722 P.2d 848 (1986).

[13] *Tennant*, 44 Wn. App. at 309.

strongly in his favor and must not weigh the proof, which is an exclusive jury function.[14]

¶22 We review de novo a trial court's refusal to give an instruction based on an issue of law.[15] Jury instructions are "sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law."[16] We hold as a matter of law that the trial court erred in giving and refusing certain instructions.

## B. Self-Defense

¶23 The defendant bears the initial burden of producing some evidence that his actions occurred in circumstances amounting to self-defense, such as a reasonable apprehension of great bodily harm and imminent danger to himself or to another.[17] The defendant need not, however, show actual danger. Rather, it is sufficient that the defendant reasonably believed that he, or another, was in danger of imminent harm.[18] In making this determination, the jury must assess the self-defense evidence from the perspective of a reasonably prudent person standing in the defendant's shoes, knowing all the defendant knows and seeing all the defendant sees.[19]

### 1. "First-aggressor" instruction

¶24 Nonetheless, a defendant whose aggression provokes the contact eliminates his right of self-defense. A first-aggressor instruction is proper when the record shows that the defendant is involved in wrongful or unlawful

---

[14] *State v. Williams*, 93 Wn. App. 340, 348, 968 P.2d 26 (1998), *review denied*, 138 Wn.2d 1002 (1999).

[15] *State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998).

[16] *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996).

[17] *See State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993).

[18] *See State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996).

[19] *Janes*, 121 Wn.2d at 238.

conduct before the charged assault occurred.[20] Thus, a first-aggressor instruction is appropriate when there is credible evidence that the defendant provoked the use of force, including provoking an attack that necessitates the defendant's use of force in self-defense.[21]

¶25 But, according to our Supreme Court, first-aggressor instructions should be used sparingly:

"[F]ew situations come to mind where the necessity for an aggressor instruction is warranted. The theories of the case can be sufficiently argued and understood by the jury without such instruction." While an aggressor instruction should be given where called for by the evidence, an aggressor instruction impacts a defendant's claim of self-defense, which the State has the burden of disproving beyond a reasonable doubt. Accordingly, courts should use care in giving an aggressor instruction.[22]

¶26 Here, as the court forecast in *Riley*, the first-aggressor instruction negated Douglas's claim of self-defense, effectively and improperly removing it from the jury's consideration.[23]

¶27 The State requested, and the trial court gave, over Douglas's objection, the following first-aggressor instruction:

No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that the defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.[24]

---

[20] *State v. Brower*, 43 Wn. App. 893, 901, 721 P.2d 12 (1986).

[21] *State v. Riley*, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999).

[22] *Riley*, 137 Wn.2d at 910 n.2 (citations omitted) (quoting *State v. Arthur*, 42 Wn. App. 120, 125 n.1, 708 P.2d 1230 (1985)).

[23] *State v. Riley*, 137 Wn.2d 904, 976 P.2d 624 (1999).

[24] Clerk's Papers (CP) at 40. This instruction was based on 11 *Washington Pattern Jury Instructions: Criminal* 16.04 at 182 (2d ed. 1994).

Neither the evidence in the record nor the applicable law support giving this instruction, especially given the Supreme Court's admonition to use such instruction only sparingly.

¶28 The record does not show that Douglas was the aggressor or that he was involved in any wrongful or unlawful conduct when he pointed his gun at McMahon in an attempt to keep McMahon from harming him and his wife and to persuade McMahon to leave the Douglases' home. Rather, the evidence shows that it was McMahon who was the aggressor.

¶29 According to eyewitnesses Douglas and Stockton, McMahon provoked the incident in the following ways. McMahon entered Douglas's house after being told to stay out. McMahon was confrontational, yelling profanities, threatening to hurt Douglas, and menacing Douglas' wife. McMahon threw liquid at Douglas and advanced toward Douglas, who was backed up against an entertainment center, with no more room to retreat. McMahon ignored Douglas's repeated demands to leave, as well as Stockton's entreaties to leave and to calm down. McMahon also threatened to kill Douglas, and Douglas, who was much smaller than McMahon,[25] feared that McMahon was going to hurt him.

¶30 No evidence controverts Douglas's testimony that he pointed the shotgun at McMahon, but did not shoot, to persuade McMahon to leave. This testimony was corroborated by Stockton, who moved his body between Douglas and McMahon, trying to restrain McMahon physically and persuade him to leave peacefully. Similarly, there is no evidence to controvert Douglas's testimony that the gun discharged accidentally.

¶31 Moreover, both Douglas and Stockton testified that before the gun fired, Douglas was withdrawing from the confrontation by turning away from McMahon and at-

---

[25] The record reflects that Douglas weighed between 170 and 160 pounds and that McMahon weighed almost 250 pounds.

tempting to lay down the gun. But when McMahon yelled and advanced toward Douglas again, Douglas whirled back around, and the gun discharged.

¶32 We recently reversed a conviction in *State v. Wingate*,[26] a factually similar case where the trial court had improperly given the "first-aggressor" instruction. Wingate pointed a gun at another person, Park, in an attempt to persuade him to stop harassing another man and to leave that man's yard.[27] While pointing his gun at Park, Wingate began to retreat.[28] But Park neither left nor retreated; instead, he advanced toward Wingate, taunting him.[29] When Wingate mistakenly thought Park was pulling a gun from his waistband, Wingate lowered his gun and shot Park in the leg.[30] At the State's request, the trial court gave a "first-aggressor" instruction, which precluded the jury's consideration of Wingate's self-defense claim.[31] Holding that this first-aggressor instruction prevented Wingate from receiving a fair trial, we reversed.[32]

¶33 Similarly, the record here does not show (1) that Douglas was involved in any wrongful or unlawful conduct before the shooting or (2) that his conduct precipitated the fight with McMahon. On the contrary, the evidence shows that McMahon, not Douglas, was the aggressor. By effectively precluding the jury's consideration of Douglas's self-defense claim, the first-aggressor instruction prevented him from receiving a fair trial. We hold that giving this instruction was reversible error.

---

[26] 123 Wn. App. 415, 98 P.3d 111 (2004).

[27] *Wingate*, 123 Wn. App. at 419.

[28] *Wingate*, 123 Wn. App. at 423.

[29] *Wingate*, 123 Wn. App. at 419.

[30] *Wingate*, 123 Wn. App. at 419.

[31] *Wingate*, 123 Wn. App. 423-24.

[32] *Wingate*, 123 Wn. App. 424.

## 2. Withdrawal instruction

¶34 Douglas next argues that when the trial court gave the first-aggressor instruction, it should also have instructed the jury that an initial aggressor's right to act in self-defense can be revived by his clear withdrawal from the altercation. In light of our holding that giving the first-aggressor instruction constituted reversible error, we do not address this issue.

## 3. Justifiable homicide instruction

¶35 Douglas also argues the trial court erred in rejecting his proposed jury instruction on justifiable homicide, which stated:

> It is a defense to the charge of manslaughter that the homicide was justifiable as defined in this instruction.
>
> Homicide is justifiable when committed *in the actual resistance of an attempt to commit a felony upon the slayer or in a dwelling or other place of abode in which the slayer is present.*
>
> The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him at the time and prior to the incident.
>
> That [*sic*] state has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.[33]

¶36 The trial court ruled that the evidence did not support giving such an instruction because, contrary to Douglas's contention, McMahon was not committing the felony of residential burglary. The trial court reasoned:

> I don't think the intention of the legislature was to allow someone to say, Get out. If they don't immediately get out, to

---

[33] CP at 51 (emphasis added).

then argue you intended to commit a burglary because you threatened me or attempted to assault me; therefore, I'm justified in shooting you. That's a strained, extremely large stretch of the burglary statute.

I don't think as a matter of law what happened here with Mr. McMahon could under any definition of the facts or the law in Washington be construed to be residential burglary. I decline to instruct on those issues.[34]

¶37 Residential burglary occurs when a person enters or remains unlawfully in a dwelling with intent to commit a crime against persons or property therein.[35] A person enters or remains unlawfully when she or he "is not then licensed, invited, or otherwise privileged to so enter or remain."[36] In *State v. Crist*,[37] we outlined a four-part test for determining what it means to "remain unlawfully" under RCW 9A.52.025:

"Unlawful remaining" occurs when (1) a person has lawfully entered a dwelling pursuant to license, invitation or privilege; (2) the invitation, license or privilege is expressly or impliedly limited; (3) the person's conduct violates such limits; and (4) the person's conduct is accompanied by intent to commit a crime in the dwelling.[38]

In *Crist*, we applied the four-part test and concluded that a juvenile, who entered his father's locked bedroom after having been told not to, unlawfully remained under the residential burglary statute.[39] While in his father's bedroom, the juvenile stole cash and cigarettes.[40] We affirmed the juvenile adjudication of residential burglary.[41]

---

[34] RP (Aug. 14-15 and Oct. 10, 2003) at 100.

[35] RCW 9A.52.025.

[36] RCW 9A.52.010(3).

[37] 80 Wn. App. 511, 514, 909 P.2d 1341 (1996).

[38] *Crist*, 80 Wn. App. at 514.

[39] *Crist*, 80 Wn. App. at 515-16.

[40] *Crist*, 80 Wn. App. at 513.

[41] *Crist*, 80 Wn. App. at 515-16.

¶38 Applying the same four-pronged test to McMahon's conduct, the record shows that he remained unlawfully in the Douglases' house with intent to commit a felony. McMahon lived on the property, generally slept in the detached bunkhouse, and had permission from the Douglases to enter the cabin for cooking, showering, and watching television. But on this occasion, Douglas expressly revoked this privilege when McMahon charged into the cabin, yelling at him and Jeanie. Douglas repeatedly told McMahon to leave. McMahon did not leave. Instead, McMahon remained on the premises, continued to threaten Douglas with physical harm, yelled profanities at Douglas and his wife, threatened to kill Douglas, and assaulted Douglas by throwing liquid on him. These uncontroverted facts established McMahon's intent to assault[42] and to harass[43] Douglas in his own home, where McMahon remained uninvited and, therefore, unlawfully.

¶39 Taking the evidence in the light most favorable to Douglas, the evidence establishes that McMahon remained unlawfully in Douglas's home with the intent to commit crimes against persons therein.[44] The evidence shows that Douglas pointed his shotgun at McMahon to resist McMahon's assaultive and harassing advances and to persuade him to leave.

¶40 It is reversible error for the trial court to refuse to give a proposed instruction if the instruction states the proper law and the evidence supports it.[45] We hold, therefore, that because the evidence supported this theory, the trial court committed reversible error in refusing to give Douglas's proposed jury instruction on justifiable homicide.

---

[42] RCW 9A.36.041.

[43] RCW 9A.46.020.

[44] *See* RCW 9A.52.025.

[45] *State v. Ager*, 128 Wn.2d 85, 93, 904 P.2d 715 (1995).

## II. Other Issues

¶41 Because we reverse based on the prejudicial jury instructions and remand for a new trial, we do not address Douglas's additional grounds for reversal because they are not likely to reoccur.

¶42 Reversed and remanded for a new trial.

Armstrong and Van Deren, JJ., concur.