# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49756-5-II |
| Respondent, | |
| v. | |
| JONATHAN ROBERT MAYSONET, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — A jury found Jonathan Maysonet guilty of second degree assault and

unlawful imprisonment of his wife after a night of drinking.  Maysonet appeals, arguing that the

trial court infringed on his right to present a defense when it refused to provide the jury with a

voluntary intoxication instruction.  We hold that the trial court erred when it refused to give the

instruction, but we hold that any error was harmless.  Consequently, we affirm Maysonet's

convictions.

## FACTS

### I.  BACKGROUND

In 2016, Maysonet lived in an apartment in Lakewood with his wife Alexandria[1], and

Alexandria's three-year-old son.  Maysonet's friend, Reniel Williams, lived in the same

apartment complex.

---

[1] Because Jonathan and Alexandria Maysonet share the same last name, we use Alexandria's
first name for clarity.  We intend no disrespect.

On the evening of March 24, 2016, the Maysonets, Williams, Deonte Leshore, and Asa Lockhart all planned to go to a restaurant and then to a dance club to celebrate Maysonet's reenlistment in the military. Maysonet planned to drink to the point of intoxication.

Around 8:00 p.m. that evening, Maysonet and Alexandria went to Williams's apartment. There, Maysonet drank at least two glasses of rum. Maysonet, Alexandria, and friends then went to a restaurant where Maysonet consumed "two or three" mixed alcoholic drinks. 9 Verbatim Report of Proceedings (VRP) at 1009.

Alexandria, Maysonet, and Williams then picked up Lockhart and the group went to a dance club and met with at least three other friends. At the club, bottles of liquor were brought to the group's table for the group to share. The group of eight people shared two large bottles of liquor. In addition to drinking from the shared bottles, Maysonet also bought drinks from the bar.

In the club, Maysonet and Alexandria began to argue. After the club closed, Williams, Alexandria, and Maysonet walked to Williams's vehicle. Once in the vehicle, Maysonet urinated in a cup and placed the cup in the vehicle's cup holder. Alexandria drove, Maysonet sat in the front passenger seat, and Williams sat in the back.

During the drive, the Maysonets continued to argue. The argument became physical when Alexandria struck Maysonet repeatedly in the face with her hand as she drove. Maysonet then threw urine from the cup at Alexandria hitting her on the side of the head. Alexandria stopped the vehicle, got out, went to the passenger side, and continued to strike Maysonet. Maysonet then threw more urine onto Alexandria.

Alexandria returned to the driver's seat and drove to the apartment complex, stopping at the complex's gate where both she and Maysonet exited the vehicle and walked to the apartment. Williams then left.

Once in the Maysonets' apartment, Maysonet went into the bedroom and laid down on the bed. Alexandria told Maysonet to leave the apartment, but Maysonet remained. Alexandria then grabbed an electrical cord and hit Maysonet with it. Alexandria also threw an Xbox game console at Maysonet, hitting him in the head and face.

Upon being struck with the game console, Maysonet jumped up and the couple began to hit each other. Maysonet punched Alexandria at least 20 times in her body and face with both fists. Alexandria began to bleed heavily, at which time Maysonet stopped punching her and gave her a T-shirt to stop the bleeding.

Alexandria walked out of the bedroom and into the living room area, and Maysonet followed her. Alexandria attempted to strike Maysonet again. At one point during the altercation, Maysonet stood in front of the apartment door prohibiting Alexandria from leaving.

Maysonet used his cell phone to call Leshore. Alexandria then ran toward Maysonet and attempted to hit him again, causing Maysonet to drop his cell phone. Maysonet tripped Alexandria, causing her to fall to the floor. Maysonet then stood over Alexandria and punched her in the face. Alexandria asked Maysonet to call 911, but Maysonet remained standing over Alexandria as she lay on the floor.

Leshore, Williams, and Lockhart rushed over to the Maysonets' apartment in response to Maysonet's call. Upon arriving at the apartment, the men saw Maysonet standing over a bloodied Alexandria who was lying on the floor.

3

Williams took Alexandria to the hospital, and Leshore and Lockhart remained with Maysonet in the apartment. Maysonet told Leshore that it would be "okay" and Leshore responded, "[N]aw man, this ain't going to be okay. You know, you messed up." 7 VRP at 861. Leshore then told Maysonet that he would be dishonorably discharged from the military and Maysonet stated, "[Y]eah it's bad." 7 VRP at 861. Maysonet then told Leshore that Alexandria "could tell them she got beat up at the club." 7 VRP at 862.

Shortly after Williams left with Alexandria, police officers arrived and arrested Maysonet. An officer walked Maysonet to the patrol car and took him to the police station.

Alexandria sustained injuries to her body and face. The injuries included diffuse swelling across her face, a cut above her left eyebrow and on her lip, multiple complex nasal bone fractures, and a fractured septum. The State charged Maysonet with first degree assault, felony harassment, and unlawful imprisonment.[2]

## II. TRIAL

At trial, the witnesses testified to the above facts. The witnesses presented conflicting evidence regarding the number of drinks Maysonet consumed, but the evidence showed that Maysonet consumed a considerable amount of alcohol. Witnesses testified that Maysonet drank two glasses of rum at Williams's apartment, three mixed alcoholic drinks at the restaurant, and multiple drinks he purchased at the bar in addition to sharing two bottles of alcohol with the group.

---

[2] The charges each included an aggravating factor based on the fact that the assault took place within the sight or sound of Alexandria's minor son, who was in the apartment during the assault. The aggravating factor is not an issue in this appeal.

Alexandria testified that Maysonet was "already drunk" before the group left for the restaurant.  Alexandria further testified that by the end of the night she could not understand what Maysonet was saying and that he was "slurring" and "mixing" things up.  5 VRP at 520.

Other witnesses testified that Maysonet did not seem "over the top drunk," was not "stumbling" after leaving the club, and did not "pass[] out" on the drive home.  6 VRP at 612, 650.

Williams testified that when he arrived at the Maysonets' apartment he saw Maysonet standing over Alexandria and that Maysonet looked "lost" and "out of it."  6 VRP at 617, 644. Williams said that Maysonet looked as though he was not fully aware of what he had done. Leshore testified that Maysonet had a "blank stare" as he was standing over Alexandria, and he looked as though he had blacked out.  7 VRP at 856.  Leshore testified that Maysonet said unusual things at the apartment, including that "[Alexandria] wanted this to happen.  She—she did this."  7 VRP at 877.

Maysonet testified in detail regarding the events of the night.  His testimony included details about the establishments he frequented, who he was with, the times of the events, conversations he had with Alexandria throughout the night, the altercations with Alexandria, and the aftermath of the altercation in the Maysonets' home.  He also testified that he vomited twice that night and that he was stumbling.

Maysonet testified that during the drive from the club to the apartment complex, Alexandria was "calling [him] all sorts of names" before she began to punch him.  9 VRP at 1025.  He said that he threw the urine on Alexandria "to get her to stop" hitting him.  9 VRP at 1076.

5

Regarding the assaults in the apartment, Maysonet described the assault as a "mutual fist fight." 9 VRP at 1033. He recalled hitting Alexandria 20 times with a closed fist, and he described his punches as hooks and uppercuts. Maysonet also stated that he hit Alexandria in the upper body and face and that he knew he was punching her. Maysonet additionally called the assault a "wild tussle" and said he was "just trying to get her off" of him. 9 VRP at 1138. Maysonet testified that after the assault in the bedroom, Alexandria tried to assault him again, and that after she cornered him in the dining room he tripped her to "get her off her feet" and make her stop hitting him. 9 VRP at 1040.

Maysonet testified that he had called Leshore to try to help Alexandria, to "have extra eyes at the house," to try to "figure out what to do" and to "get her to stop and calm down, stop hitting" him. 9 VRP at 1105, 1039. Maysonet stated that after Alexandria left for the hospital, but before police arrived, he went into the bathroom and vomited. Maysonet also testified that he vomited again in the police station.

Regarding his consciousness on the night of the incident, Maysonet testified that he was "[b]lacking out, fading out, drunk, getting to that level. Not there, but getting there, progressing there." 9 VRP at 1072. However, Maysonet also stated, "I wasn't passing out. I wasn't passing out. Stumbling, I guess you could say." 9 VRP at 1061. During direct examination, Maysonet testified that he had no memory of some periods of time throughout the evening. However, during cross-examination, Maysonet repudiated the possibility that he could have forgotten threatening to kill Alexandria, strangling her, or punching her more than what he had testified to. Maysonet affirmed that he was not falling down and not passing out on the night of the incident.

6

Maysonet also affirmed that he had a clear memory of everything that happened that night and during the incidents, and that his recall was not an issue.

At the close of the evidence, Maysonet proposed a voluntary intoxication instruction and the State objected. The court denied Maysonet's request for the voluntary intoxication instruction, stating that the "substantial link that's required by the case law was not ever made present in this case." 9 VRP at 1158.

During closing argument, Maysonet argued:

> I think it's pretty clear that alcohol was involved in all parties concerned here. [Maysonet's] actions leading up to this, you can infer, he was intoxicated based upon his behavior at the club, the amount of alcohol he consumed, the fact that he threw a cup of pee in his wife's face in the car.

10 VRP at 1200-01. Defense counsel also argued that the jury needed to take into consideration that Maysonet's behavior was indicative of alcohol consumption and that he therefore had lacked intent to inflict great bodily harm on Alexandria. But counsel also stated, "I suspect that you will find that [Maysonet] assaulted [Alexandria]" and that convicting Maysonet of second degree assault was "appropriate . . . given the damage that was done." 10 VRP at 1199, 1210.

During rebuttal argument, the State argued that the court did not instruct the jury that alcohol was a defense and argued that the only testimony about "alcohol consumption being to some extreme degree was a little bit from [Alexandria] and a little bit from [Maysonet]." 10 VRP at 1212.

The jury then found Maysonet guilty of the inferior degree crime of second degree assault, found him guilty as charged of unlawful imprisonment, and found him not guilty of felony harassment.

ANALYSIS

Maysonet argues that sufficient evidence supported a voluntary intoxication instruction and that the trial court's failure to give the instruction violated his right to present a defense. We agree that sufficient evidence supported the instruction. However, we hold that the court's failure to provide the instruction was harmless.

A.      *Legal Principles*

Where, as here, the trial court refuses to give an instruction based on the facts of the case, we review the refusal for an abuse of discretion. *State v. Brightman*, 155 Wn.2d 506, 519, 122 P.3d 150 (2005). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *State v. Arredondo*, 188 Wn.2d 244, 265, 394 P.3d 348 (2017). It is reversible error to refuse to give a proposed jury instruction if the instruction properly states the law and the evidence supports it. *State v. Green*, 182 Wn. App. 133, 152, 328 P.3d 988 (2014).

We review the evidence in the light most favorable to the instruction's proponent. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000). And we draw all reasonable inferences in the light most favorable to the defendant. *State v. Douglas*, 128 Wn. App. 555, 561-62, 116 P.3d 1012 (2005). Thus, when reviewing the trial court's decision here, we view all evidence and inferences in Maysonet's favor to determine whether the trial court abused its discretion when it determined that there was insufficient evidence to support the voluntary intoxication instruction.

B.       *Voluntary Intoxication Instruction Warranted*

Where a defendant seeks a voluntary intoxication jury instruction, he or she must show (1) the charged crime has a specific mental state, (2) there is substantial evidence the defendant was drinking, and (3) evidence that the defendant's drinking affected his or her ability to form the required mental state.  *State v. Everybodytalksabout*, 145 Wn.2d 456, 479, 39 P.3d 294 (2002).  Evidence of drinking alone is insufficient; there must be substantial evidence of the alcohol's effects on the defendant's mind or body.  *State v. Gabryschak*, 83 Wn. App. 249, 253, 921 P.2d 549 (1996).

There is conflicting case law regarding the amount of evidence required to support a voluntary intoxication instruction.  *See Gabryschak*, 83 Wn. App. at 253 (holding that evidence that defendant was angry, physically violent, and threatening when intoxicated was not sufficient to establish that he was too intoxicated to form the required intent); *State v. Finley*, 97 Wn. App. 129, 133, 135, 982 P.2d 681 (1999) (holding instruction not warranted where no evidence existed showing defendant could not form required intent even where defendant smelled of alcohol, had bloodshot eyes, slurred speech, had two belligerent confrontations with his girlfriend, other bar patrons, and police); *State v. Rice*, 102 Wn.2d 120, 122-23, 683 P.2d 199 (1984) (holding instruction warranted where defendants drank beer all day, took between two and five Quaaludes, could not hit ping-pong balls, and one did not feel being struck by a vehicle); *State v. Washington*, 36 Wn. App. 792, 792, 677 P.2d 786 (1984) (holding instruction warranted where evidence showed the defendant drank a substantial amount of alcohol, was involved in an automobile accident, and made numerous attempts to strike an officer (*see* 34 Wn. App. at 411-12 (1983)).

We agree that intoxication is not an "all-or-nothing proposition." *Gabryschak*, 83 Wn. App. at 253. A person can be intoxicated and still be able to form the requisite mental state, or he can be so intoxicated as to be unconscious. *State v. Coates*, 107 Wn.2d 882, 891, 735 P.2d 64 (1987).

The issue here is whether sufficient evidence existed to show that Maysonet's intoxication affected his ability to form the requisite mental state to commit the crimes of second degree assault and unlawful imprisonment.[3] Both of these crimes contain a specific mental state. Intent is an element of both first and second degree assault, and knowingly is an element of unlawful imprisonment. A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime. A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he or she is

---

[3] RCW 9A.36.011(1) provides:
> A person is guilty of assault in the first degree if he or she, with *intent* to inflict great bodily harm:
> . . . .
> (c) Assaults another and inflicts great bodily harm.

(Emphasis added.)

RCW 9A.36.021(1) provides:
> (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm.

RCW 9A.40.040 (1) provides:
> A person is guilty of unlawful imprisonment if he or she *knowingly* restrains another person.

(Emphasis added.)

aware of that fact, circumstance, or result. *State v. Allen*, 182 Wn.2d 364, 372, 341 P.3d 268 (2015).

The evidence in this case is conflicting. But in determining whether Maysonet is entitled to this instruction, we examine all evidence and inferences from that evidence in his favor. *Douglas*, 128 Wn. App. at 561-62.

Here, Williams testified that when he saw Maysonet after arriving at the apartment to help, Maysonet looked "lost" and "out of it" and as though he was "not even here." 6 VRP at 617. Leshore also testified that Maysonet looked as though he had "blacked out" and had a "blank stare" as he stood over Alexandria. 7 VRP at 856; 875. Alexandria testified that Maysonet was "slurring" and "mixing" things up by the end of the night. 5 VRP at 519. Maysonet also testified that he did not "fully understand the situation" or "how—why it even got to that point." 9 VRP 1116. He also testified that he vomited twice and was stumbling and "[b]lacking out, fading out, drunk, getting to that level." 9 VRP at 1072.

The record reflects substantial evidence of Maysonet's drinking and level of intoxication. And there is ample evidence of the effect of intoxication on both his mind and body: his appearance of blacking out, looking lost, vomiting, and slurring speech. Viewing the evidence in the light most favorable to Maysonet, we hold that the trial court erred when it denied Maysonet's voluntary intoxication instruction.

Maysonet further argues that the trial court's denial of the instruction led to a violation of his Sixth Amendment right to present a defense. As discussed above, the trial court erred in denying Maysonet's request for a voluntary intoxication instruction. Moreover, when Maysonet tried to argue that he lacked specific intent because of his intoxication, the State reminded the

jury that the court did not instruct the jury that alcohol was a defense. Thus, trial court also violated Maysonet's right to present the defense of voluntary intoxication.

Accordingly, we hold that the trial court erred by denying Maysonet's voluntary intoxication instruction and erred by violating Maysonet's right to present a defense. However, as shown below, the trial court's error was harmless.

C.      *Harmless Error*

The State argues that if the trial court erred by refusing to give a voluntary intoxication instruction, such error was harmless. We agree.

Under the constitutional harmless error standard, an error in jury instructions is harmless if within the entire context of the record, it is harmless beyond a reasonable doubt. *State v. Grimes*, 165 Wn. App. 172, 187, 267 P.3d 454 (2011). A constitutional error does not require reversal if, beyond a reasonable doubt, the untainted evidence is so overwhelming that a reasonable jury would have reached the same result in the absence of the error. *State v. Saunders*, 120 Wn. App. 800, 813, 86 P.3d 232 (2004). We apply the constitutional standard to this case because the trial court violated Maysonet's right to present a defense.

The overwhelming evidence in this case makes clear that the jury would have reached the same result even if the trial court had provided a voluntary intoxication instruction. Maysonet testified at length about how he acted with intent and knowledge on the night of the incident.

Maysonet testified that he decided to throw urine on Alexandria during the car ride home to make her stop hitting him. Maysonet also testified that he hit Alexandria in the bedroom to "get her off" of him and similarly tripped her to end her attack of him. 9 VRP at 1138. Maysonet further testified that he threw hooks and uppercuts at Alexandria and described the

12

type of punches he used on her. Maysonet also testified that he called his friend in the middle of the altercation with the intent to "have extra eyes at the house" and to "get [Alexandria] to calm down and stop hitting" him. 9 VRP 11/15/16 at 1105, 1039. Maysonet's entire testimony was extremely detailed, and it clearly and precisely described details of the evening including details of his intent for his actions.

Moreover, Maysonet explicitly stated that he did not actually "pass out." He did not testify that he experienced some failure of his mental acuity on the night of the incident. Rather, Maysonet testified that he remembered assaulting Alexandria and remembered the events of the evening with clarity, despite his drinking. He also denied that his consumption of alcohol affected his memory regarding whether he threatened or strangled Alexandria.

Additionally, Maysonet presented no evidence that his alcohol consumption affected his ability to act knowingly with respect to his unlawful imprisonment of Alexandria. Maysonet knew how many times and with what force he hit Alexandria, and he also knew that he seriously injured her. Maysonet also had the awareness and knowledge to call his friend for help during the incident. Although he denied that he refused to let Alexandria leave the apartment, Maysonet presented no evidence that he lacked the ability to knowingly restrain Alexandria.

Further, on the night of the incident, Maysonet acknowledged that the situation "was bad" and recognized that he faced the possibility of being dishonorably discharged. Maysonet's understanding of his actions was also exhibited by his suggesting that Alexandria make up a lie about how she became injured. This uncontroverted evidence clearly shows that Maysonet understood the consequences of his actions and also shows that he was not so affected by alcohol that he was unable to form the requisite mental state to commit the crimes.

No. 49756-5-II

Given his testimony, and considering all the evidence within the entire context of the record, the evidence of Maysonet's intent to assault and his knowledge of unlawful imprisonment is so overwhelming that no reasonable jury would have reached a different verdict, even if provided with a voluntary intoxication instruction. Accordingly, any error in failing to instruct the jury on voluntary intoxication was harmless beyond a reasonable doubt.

CONCLUSION

Because substantial evidence supports the voluntary intoxication instruction, the trial court erred when it refused to give the instruction. The trial court also erred by violating Maysonet's right to present a defense. However, the trial court's errors were harmless beyond a reasonable doubt. Accordingly, we affirm Maysonet's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Maxa, C.J.

_____
Lee, J.

14