THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81326-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER JAMES DREYER, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

ANDRUS, A.C.J. — Christopher Dreyer appeals his conviction for residential burglary, challenging the trial court's accomplice liability instructions. Because there was sufficient evidence to prove Dreyer aided or agreed to aid another in the crime of residential burglary, we affirm his conviction. We remand solely for resentencing under State v. Blake, 197 Wn.2d 170, 481 P.3d 521 (2021).[1]

## FACTS

John Block and his business partner, Jess Kenoyer, purchased a home in Bellingham in late April of 2019. They intended to renovate the vacant house and resell it at a profit. In late October or early November 2019, Block had a new stove and refrigerator delivered to the house. The utilities remained on inside the house

---

[1] The State concedes that Dreyer must be resentenced in light of Blake.

Citations and pin cites are based on the Westlaw online version of the cited material.

but Block left the new appliances unplugged. Block and Kenoyer did not visit the house again for three weeks. During that time, they had the heat turned down.

On November 25, 2019, Block met an electrician at the house to discuss some improvements he and Kenoyer wanted done. When Block entered through the back door, he noticed the door frame had been split in half. It was very hot inside the house and Block could hear the washing machine or dryer running. He found a man, later identified as Christopher Dreyer, inside the house. Dreyer demanded to know who Block was. When Block identified himself as the owner, Dreyer retreated inside the house.

Block followed him and asked Dreyer who he was. Dreyer said he had been "hired to fix up the place" and "John Sorenson hired me." Block did not know anyone named John Sorenson. Neither he nor Kenoyer had given anyone permission to be inside the home. As Block walked through the kitchen, he saw a cast-iron pan with food bits on the stove, and empty beer bottles and take-out food containers on the counters. The kitchen smelled like someone had recently cooked.

When Block walked into the living room, he saw Dreyer pulling personal items, including what appeared to be new doorknobs with keys and the plastic packaging they came in, out of a cupboard and drawers and stuffing them into a backpack. Block testified that it was then that "it finally clicked that this is someone who's not supposed to be here, and I don't know this person, so I kind of put two and two together at that time."

Block went outside to call Kenoyer and, about 30 seconds later, saw Dreyer leave the house by the front door. Block yelled at Dreyer to "take a hike" and Dreyer yelled back that he was going to call the police. Block took a photograph of Dreyer as he walked away.

Block called 911 and followed Dreyer in his car as Dreyer walked down the street. Block saw Dreyer enter some woods on a trail and then stop to gather something from the bushes. Block waited for the police on the corner near the trailhead.

Meanwhile, Kenoyer arrived at the house where he saw the electrician and his apprentice in the driveway talking with an intoxicated man whom he did not recognize. Kenoyer drove to the trailhead to meet Block. Kenoyer saw the man he had seen talking to the electricians walk down the same trail Dreyer had used minutes earlier. Police arrived 15 or 20 minutes later but were unable to locate Dreyer. The police, Block, and Kenoyer, then returned to the house.

Block found the refrigerator plugged in and full of food. The police found bath mats, toothbrushes, toothpaste, a hairbrush and comb, hairspray, and shower curtains in the bathroom, a scented candle on the living room mantel, and bleach and a mop and other personal items in various locations in the house. In an upstairs bedroom, they found a sheet laid out on the floor, covered with a sleeping bag. In the garage they found more personal items, including a blanket on the ground.

The police took some items for fingerprinting and the owners left everything in the house as they found it, locked the door as best they could, and left. Kenoyer turned the thermostat back down before he left.

The next day, November 26, Kenoyer returned to the house and found the heat turned up again and the washing machine running. It appeared someone had again recently cooked food in the kitchen. Kenoyer quickly left and called the police. But the police searched the house and found no one inside. Kenoyer collected the personal items from the house and put them outside in a bin in the driveway. He then boarded up the damaged back door to the house.

The police were able to isolate a fingerprint on one of the empty bottles they removed from the house. The print matched Dreyer's right thumb.

The following morning, November 27, when Kenoyer went by the house, he noticed that the items he had left in the driveway were gone. Around noon, a neighbor sent him a text message with a photograph of Dreyer using the house's outdoor water spigot to fill an electric kettle. Kenoyer again called the police and met them at the house. After 10 minutes, Dreyer walked out of the back yard and the police detained him. The arresting officer testified that Dreyer was wearing sneakers that matched the shoes worn by the man Block photographed leaving the house on November 25.

When they searched the house, it was in the same condition as Kenoyer left it the day before, but they found some of the personal items Kenoyer had removed from the house inside a detached shed. They also found the jacket and

backpack Dreyer was wearing on November 25, 2019.  They found a pry bar tool inside Dreyer's backpack.

Dreyer told police that he was renting the shed or garage from his grandmother and he was legally allowed to be there.  He denied ever being inside the house.  Dreyer also said the police lacked probable cause to arrest him for burglary because such a charge would require proof he had the intent to damage or steal property.  He insisted that his conduct was nothing more than a trespass.

The State charged Dreyer with residential burglary under RCW 9A.52.025(1).[2]  During his February 2020 trial, Dreyer argued that he believed, in good faith, that he had permission to be inside the house and the State could not prove otherwise.  In response, the State asked the court to instruct the jury on accomplice liability.  The State contended that if Dreyer intended to argue that another person was responsible for entering the home and turning on the appliances and heat, it should be permitted to argue that Dreyer was acting in concert with another suspect.  Dreyer maintained that while there was evidence that a second person was involved, there was no evidence of a connection between Dreyer and this second individual.  In light of Dreyer's argument that a second person was involved in burglarizing the house, evidence that more than one person was present on November 25, and that Dreyer possessed lock hardware, suggesting he was a participant in the crime, the court granted the State's request for the accomplice liability instruction.

---

[2] Under this statute, "(1) A person is guilty of residential burglary if, with intent to commit a crime against a person or property therein, the person enters or remains unlawfully in a dwelling other than a vehicle."

In closing, the State argued Dreyer entered and remained unlawfully in the Block/Kenoyer house with the intent to commit a crime against property, namely the theft of electricity, heat and water. Dreyer argued he did not enter the house unlawfully because he believed he had permission to be inside. He maintained that when he was arrested, he chose not to point the finger at this other individual because he knew that would lead to him being arrested as well. The State contended that even if the jury accepted the possibility of a second person being involved in the burglary, "the evidence all indicates that . . . Mr. Dreyer is an equal and active participant."

The jury convicted Dreyer as charged. He appeals his conviction and sentence.

ANALYSIS

Dreyer challenges the trial court's instructions on accomplice liability, arguing the evidence at trial did not support the giving of an accomplice liability instruction.

A party may have instructions embodying its theory of the case if there is evidence to support that theory; it is error to give an instruction not supported by the evidence. State v. Benn, 120 Wn.2d 631, 654, 845 P.2d 289 (1993). To determine if sufficient evidence exists to warrant an accomplice liability instruction, we review the evidence to determine if it was sufficient to permit conviction by a rational trier of fact. State v. Berube, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003). We view the supporting evidence in the light most favorable to the party that

requested the instruction. State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

To prove that Dreyer was an accomplice to residential burglary, the State had to present evidence that Dreyer solicited, commanded, encouraged, or requested another to commit residential burglary, or aided or agreed to aid another in the commission of that crime. RCW 9A.08.020(3)(a). There must be evidence that Dreyer had actual knowledge that the principal was engaged in the charged crime and had actual knowledge that he was furthering that crime. RCW 9A.08.020(3)(a); State v. Allen, 182 Wn.2d 364, 374, 341 P.3d 268 (2015).

Dreyer argues that while there may have been evidence of two individuals being inside the house, there was no evidence to show that he acted in complicity with this other individual with the intent to commit a crime. We disagree.

There is overwhelming evidence Dreyer entered the house with the intent to commit a crime against property. Block found his back door jamb split open and Dreyer inside the house, using appliances, water, electricity, and heat. Dreyer had a pry bar in his backpack. A reasonable juror could conclude from this evidence that Dreyer broke into the house and did so to use utilities—heat, water, and electricity—and kitchen appliances that belonged to Block and Kenoyer. Significantly, the nature and number of personal items found at the house provided compelling evidence that Dreyer was not just passing through but had been living in the house for some time and using utilities throughout this time.

And there was evidence from which a rational jury could conclude that Dreyer did not act alone. Dreyer told Block that Sorenson gave him permission to

be inside the house. But neither Block nor Kenoyer gave anyone named Sorenson permission to be there or to undertake any renovations to the house. If Sorenson had let Dreyer into the house, he did so unlawfully. And Dreyer fled from the house after being confronted by Block—an act at odds with his contention that he believed he had permission to be inside. This evidence would support a jury determination that Dreyer knew neither he nor Sorenson had the legal right to enter or remain in the house.

There was also evidence suggesting more than one person was living in the house with Dreyer. There was one sleeping/bedding area in an upstairs bedroom and another area for someone to sleep on the ground in the garage. The police also found more than one toothbrush in the bathroom, and enough food, empty beer bottles, and personal items in the house to suggest Dreyer was not squatting in the house by himself. And on the same day that Block discovered Dreyer inside the house, Kenoyer saw another man talking to the electrician and his apprentice in the driveway and then saw this same man follow Dreyer into the woods after Dreyer fled the home. Although the two men were not seen together, there is sufficient circumstantial evidence from which a rational jury could conclude there was a nexus between them.

The evidence also supports the conclusion that Dreyer's role was not simply presence inside the house. Before Dreyer fled, he gathered up several new doorknobs and locksets, with their plastic packaging, and stashed them in his backpack. A rational jury could infer from this evidence that if someone named

Sorenson let Dreyer inside, Dreyer was helping him convert the house to their exclusive use by actively planning to change the locks on the house.

This evidence supports a jury determination that Dreyer aided or agreed to aid another in committing residential burglary. The trial court did not err in giving an accomplice liability instruction.

Dreyer next argues that the wording of Instruction No. 8 erroneously relieved the State of its burden to prove beyond a reasonable doubt that Dreyer acted with knowledge that his actions would promote or facilitate the commission of the crime, as required by RCW 9A.08.020(3)(a). Instruction No. 8 provided:

> If you are convinced beyond a reasonable doubt that the Defendant participated in the crime of Residential Burglary and that crime has been proven beyond a reasonable doubt, you need not determine whether the defendant was an accomplice or a principal.

Dreyer focuses on the phrase "the Defendant participated in the crime" to argue that the State was relieved of the burden of proving actual knowledge.[3]

But Instruction No. 7 instructed the jury on the knowledge element that Dreyer contends is missing in Instruction No. 8.[4] The trial court also instructed the

---

[3] The State contends Dreyer waived his right to assert this error on appeal because he did not object to this wording below. The State is correct that Dreyer explicitly told the court it had no objections to the specific wording of Instruction No. 8. But Dreyer objected generally to Instruction No. 8 below, so we choose to address Dreyer's argument on appeal.

[4] Instruction No. 7 stated:

> A person is guilty of the crime of Residential Burglary if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime of Residential Burglary.
>
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> (1)    solicits, commands, encourages, or requests another person to commit the crime; or
> (2)    aids or agrees to aid another person in planning or committing the crime.

jury that "[d]uring your deliberations, you must consider the instructions as a whole." When read as a whole, Instruction Nos. 7 and 8 properly informed the jurors of the applicable law regarding accomplice liability. See State v. Douglas, 128 Wn. App. 555, 562, 116 P.3d 1012 (2005) ("Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.") The instructions did not relieve the State of its burden to prove beyond a reasonable doubt that Dreyer acted with knowledge that his actions would promote or facilitate the commission of the crime.

We affirm the conviction and remand to the trial court for resentencing in light of Blake.

_Andrus, A.C.J._

WE CONCUR:

_Colm, J._      _Appelwick, J._

---

The word 'aid' means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of the crime of Residential Burglary is guilty of that crime whether present at the scene or not.

Instruction No. 7 mirrors 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51 (5th ed. 2021), which in turn mirrors RCW 9A.08.020(3)(a)(i-ii).