IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34943-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEACON JAMES WALLETTE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A witness to the charged crimes inconsistently testified to whether the victim of an assault was armed. In turn, the trial court precluded defendant Deacon Wallette from examining the witness as to his belief that the victim carried a weapon. We hold that Wallette was not afforded a meaningful right to a defense and reverse his convictions.

## FACTS

This prosecution of Deacon Wallette arises from a physical altercation between Wallette and his friend, Michael Cowan, during the early morning hours of November 6, 2015. On November 4, Cowan drove Wallette to the hospital because Wallette's eye required medical attention. After leaving Wallette at the hospital, Cowan departed the

hospital environs. Following Wallette's discharge from the hospital, he discovered Cowan's absence. Wallette had no cell phone and little money to use for a ride home. Wallette sold his watch to obtain fare for a taxi.

During the succeeding night of November 5, 2015, Deacon Wallette traveled to Michael Cowan's home to confront Cowan about the abandonment at the hospital. On arriving at Cowan's abode, Wallette told Cowan that Cowan owed him money in order to repay Wallette for taxi fare. Wallette first demanded $40, which Cowan found reasonable. Wallette then increased his entreaty to $100 since Cowan's unneighborly act resulted in Wallette selling his watch. Cowan refused to pay Wallette $100. Wallette left Cowan's residence and returned to Wallette's home.

Deacon Wallette, Michael Cowan, and witness Chris Curran disagree as to the details of the events transpiring after Cowan's refusal to pay. We relate the varying narratives.

Deacon Wallette did not testify at trial, but the State played for the jury a recorded interview of Wallette by police detectives. According to Wallette, on the evening of November 5, 2015, and after Wallette returned home from his first excursion to Michael Cowan's residence, Wallette's friend Chris Curran arrived at Wallette's house. In the early morning hours of November 6, Curran informed Wallette that Cowan told Curran that Cowan planned on rendering Wallette a "hot shot." Ex. P5, at 10 min., 59 sec. through 11 min., 28 sec. A "hot shot" is a lethal dose of drugs. A flabbergasted Wallette

2

wished to return to Michael Cowan's home to again talk to Cowan. Wallette asked Curran to venture to Cowan's house with him. According to Wallette, he and Curran did not know what would transpire that night. Wallette did not seek to harm Cowan, but to question Cowan about killing him over money.

Deacon Wallette informed law enforcement during the interview that, when he and Chris Curran reached Michael Cowan's home, Cowan stood on his residence's deck. Wallette asked Cowan if the latter had Wallette's money, to which question Cowan replied: "yeah, I want to talk to you about it." Cowan invited Curran and Wallette into Cowan's residence, and all three men entered the home. Ex. P5, at 13 min., 43 sec, through 13 min., 45 sec. Wallette and Cowan spoke around the dining room table, during which time Wallette observed Cowan's hand in his pocket.

According to Deacon Wallette, he told Michael Cowan "what the f*** man, dude you owe me $100, you're going to try to kill me over $100 man? You're going to try to give me a hot shot?" Ex. P5, at 14 min., 25 sec. through 14 min., 33 sec. Cowan feigned to lack knowledge of any projected hot shot. Wallette responded that Chris Curran, who knew nothing about Wallette's demand for money, warned Wallette that Cowan intended to administer a hot shot to Wallette. Cowan then behaved bizarrely. Cowan removed his hand from his pocket and displayed a knife. Wallette grabbed a metal baton he saw on the table and struck Cowan on the forehead with the instrument. Cowan lunged at

Wallette with the knife so Wallette struck Cowan's arm with the baton to knock the knife from Cowan's hand.

According to Deacon Wallette's narrative, Michael Cowan grabbed Wallette and the two wrestled throughout the kitchen. Cowan accidently cut his own hand with the knife during the fight when Cowan smacked the kitchen counter. Wallette walloped Cowan again with the metal baton, and Cowan collapsed to the floor.

During the interview with law enforcement, Deacon Wallette twice denied bringing a machete to Michael Cowan's home. Wallette later conceded the presence of a machete, and he added to his story. According to Wallette, he brandished the machete once Cowan lay on the floor, but he never touched Cowan with the machete. Wallette stood near Cowan waving the machete and enlightened Cowan that, if Cowan tried to slay Wallette, Wallette would kill Cowan first. Wallette hoped the machete would scare Cowan from trying to kill Wallette. Cowan threw two dollars at Wallette and told him to take the money. Cowan offered his car keys to Wallette, but Wallette declined the offer. Wallette grabbed the money. According to Wallette, the confrontation lasted five minutes before Chris Curran stated "let's go." Ex. P5, at 16 min., 40 sec. through 16 min., 47 sec.

According to Deacon Wallette, he appropriated the baton as he left Michael Cowan's home, and he discarded the metal instrument in an alleyway. Wallette took the machete to Chris Curran's house because he did not want the weapon in his possession

4

when police located him.

Deacon Wallette later posted on Facebook that he broke Michael Cowan's arm and leg and cracked his skull. Wallette assumed that he broke bones from the impact of the metal baton. Nevertheless, Wallette guessed inaccurately as to Cowan's injuries. The emergency room physician, who treated Cowan, diagnosed only a laceration on the hand and swelling of clotted blood to Cowan's forehead. The laceration severed a tendon and necessitated surgical repair.

Michael Cowan testified during trial. Cowan averred that he stood outside his home when he saw Deacon Wallette arrive on his bicycle. Cowan did not want to interact with Wallette so he entered his home and shut the front door. Cowan denied that he invited Wallette or Chris Curran into his home. After shutting the front door, Cowan walked toward the bathroom. Suddenly, in the corner of his eye, Cowan saw Wallette walking behind him inside the home and displaying a baton. Cowan testified that Curran brought the baton. From behind, Wallette hit Cowan in the head with the baton for no apparent reason, Cowan crumpled to the floor, and he lost consciousness.

Once Michael Cowan regained consciousness, he overheard Deacon Wallette telling someone "'get me the machete.'" Report of Proceedings (RP) at 154. Cowan first answered that he could not remember whether Wallette or Curran possessed a machete, but later testified that Wallette drew a machete toward Cowan's face. The machete sliced his hand as he blocked the weapon to protect his face.

5

Michael Cowan testified that Deacon Wallette put the tip of the machete into Cowan's knee and twisted the weapon, while declaring he would kill Cowan. Wallette also struck his leg twice with the baton. Wallette asked Cowan if he had Wallette's money, so Cowan removed his wallet from his pants to show he possessed no money. Wallette grabbed the wallet. Before Wallette left, Wallette warned that, if Cowan told anyone of the confrontation, Wallette would kill Cowan. Cowan believed that Wallette would execute the threat.

During trial testimony, Michael Cowan denied possessing a knife during the confrontation. Cowan also denied knowing the nature of a hot shot and formulating a plan to kill Deacon Wallette. Cowan later admitted to asking someone to describe a hot shot and to explain the purpose of the hot shot. Cowan admitted to the possibility of him joking about delivering a hot shot, but denied any intent to administer the potion.

Chris Curran's testimony looms critical to this appeal. During trial, Curran recounted walking to Michael Cowan's home with Deacon Wallette in the early morning hours of November 6. Wallette desired to discuss money owed and the threatened hot shot. Curran observed Wallette with a handle, protruding from a backpack. The handle looked like a machete handle.

According to Chris Curran, he and Deacon Wallette knocked on Cowan's front door, and Cowan invited the two men inside his home. Curran stood in the lit living room while Wallette and Cowan spoke for fifteen minutes in the darkened kitchen.

Curran heard angry voices for two minutes. Curran saw Wallette retrieve a metal baton

from his back pocket and repeatedly strike Cowan on the arm with the weapon while

Cowan laid on the floor and Wallette stood over Cowan.

The following exchange occurred between the State's attorney and Chris Curran:

> Q. Okay. Do you recall if Mike had any weapons on him?
> A. I believe Mike did.
> Q. Do you recall talking to the police in this particular case?
> A. Yes.
> Q. Okay. Do you recall indicating to Detective Cestnik that you were sure that Cowan was not armed when Wallette began hitting him with a club; do you remember that?
> A. Yes.

RP at 231-32. Later Curran responded to the State's questioning:

> Q. And you never saw Mike with a knife, correct?
> A. Correct.

RP at 234. We later quote portions of Chris Curran's cross-examination by defense

counsel.

Chris Curran witnessed Deacon Wallette hit Cowan only on the arm with the

baton. Curran never saw Wallette remove the machete from the backpack. As soon as

Wallette hit Cowan with the baton, Curran could hear screaming and he immediately left

the premises.

## PROCEDURE

The State of Washington charged Deacon Wallette with, among other charges,

assault in the first degree, burglary in the first degree, robbery in the first degree, and

7

felony harassment. For all four counts, the State charged deadly weapon enhancements for use of the baton or the machete. Deacon Wallette asserted that he acted in self-defense to the knife Michael Cowan pulled.

We previously wrote that during the State's direct examination of Chris Curran, the State asked if Curran recalled whether Michael Cowan had any weapons on him. Curran responded "I believe Mike did." RP at 231. On cross-examination, defense counsel wished to question Chris Curran further regarding his belief of Curran being armed. This appeal focuses on this portion of the cross-examination. Counsel inquired:

> Q. Okay. And you said you believed that Mr. Cowan had a weapon?
> [State]: Mischaracterization of his testimony.
> THE COURT: It is. Sustained.
> Q. . . . Do you believe that Mr. Cowan had a weapon at that time?
> A. I believe he did.
> [State]: Objection, your Honor. He indicated that Mr. Cowan did not have a weapon.
> THE COURT: That's true. Sustained.
> THE WITNESS: I believe he did.
> [State]: Objection. There is no question posed to this witness.
> THE COURT: Next question, Counsel. Let's move on.

RP at 244.

Deacon Wallette requested the jury be instructed on self-defense, be given a no duty to retreat instruction, and be instructed on the lesser included offense of fourth degree assault. The State opposed the fourth-degree assault and no duty to retreat instructions. The State asked that a first aggressor instruction be given, if the court delivered a self-defense instruction. Wallette opposed the first aggressor instruction. The

8

trial court denied a fourth-degree assault jury instruction and a no duty to retreat instruction. The trial court delivered a self-defense and first aggressor instruction. During closing argument, the State told the jury at least five times that Chris Curran testified that Michael Cowan was not armed or that the only person who testified to Cowan being armed was Deacon Wallette.

The jury convicted Deacon Wallette on all counts except the first degree robbery charge. The jury also returned special verdicts finding that Wallette was armed with a deadly weapon at the time of the commission of the three crimes of conviction.

The trial court followed the State's recommendation to sentence Deacon Wallette to 150 months' confinement on the assault charge concurrent to the lesser sentences on the remaining charges. The court imposed four-year deadly weapon enhancements for the assault and burglary and a one-year enhancement for the harassment. The sentencing court ran the enhancements consecutively to each other and the standard range sentence for a total of 258 months' confinement.

## LAW AND ANALYSIS

### Constitutional Right to a Defense

On appeal, Deacon Wallette challenges his three convictions and his sentencing. Since we reverse his convictions, we do not address any assigned error in the sentencing. Wallette complains that the trial court precluded his trial counsel from questioning Chris Curran about Curran's belief that Michael Cowan possessed a weapon. He argues that

9

the trial court commented on the evidence when the court agreed with the State, in the

presence of the jury, that Cowan previously testified that Cowan had no weapon. He also

argues that the trial court violated his right to present a defense when the court prevented

his defense counsel from exploring Curran's belief that Cowan possessed a weapon. We

agree that the court should have permitted defense counsel to question Curran about his

belief when the State's earlier questioning led Curran to state his conviction that Cowan

possessed a weapon. Therefore, we do not address the contention that the court

commented on the evidence.

The Sixth Amendment of the United States Constitution and article I, section 22 of

the Washington Constitution guarantee an accused the meaningful opportunity to present

a complete defense. U.S. CONST. amends. VI, XIV; Const. art. I, § 22; *Holmes v. South

Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006). The

constitutional right to present a complete defense limits the authority to exclude evidence

relevant to the defense from criminal trials. *Holmes v. South Carolina*, 547 U.S. at 324.

At a minimum, criminal defendants have the right to put before the jury evidence that

might influence the determination of guilt. *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107

S. Ct. 989, 94 L. Ed. 2d 40 (1987).

Deacon Wallette's trial counsel sought to explore, during cross-examination, Chris

Curran's belief that Michael Cowan possessed a weapon. A criminal defendant possesses

constitutional rights both to present testimony in his or her defense and to confront and

10

cross-examine witnesses. *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983).

Courts should zealously guard the basic right to cross-examine in a criminal case. *State*

*v. Swenson*, 62 Wn.2d 259, 278, 382 P.2d 614 (1963), *overruled on other grounds by sub*

*nom. State v. Land*, 121 Wn.2d 494, 851 P.2d 678 (1993). The opportunity to cross-

examine must be real and meaningful and not a mere matter of form. *In re Application*

*for a Writ of Habeas Corpus of Pettit*, 62 Wn.2d 515, 521, 383 P.2d 889 (1963). Cross-

examination functions as the principal means to test the believability of a witness and the

truth of his testimony. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d

347 (1974).

Michael Cowan and Deacon Wallette differed as to whether Cowan armed himself

and whether Wallette acted in self-defense. Chris Curran thus became an important

witness. Although he later admitted that he told law enforcement that Cowan was not

armed, Curran twice testified to, during the State's questioning, his belief that Cowan

armed himself. A witness's inconsistency does not result in one inconsistent version of

the facts being excluded from consideration by a jury. Instead, further examination about

the inconsistency could help the jury to arrive at the truth. The trial court stopped

defense counsel from cross-examining Curran on the basis of why Curran concluded that

Cowan was armed. Wallette could not fully exercise his constitutional right to cross-

examine Curran on this crucial factual dispute.

The State contends that Chris Curran could not testify to his "belief" that Michael Cowan possessed a weapon on him. We agree with the State that the right to present a defense is not absolute, such that a defendant has only the right to present relevant evidence, with no constitutional right to present irrelevant evidence. *State v. Gregory*, 158 Wn.2d 759, 786 n.6, 147 P.3d 1201 (2006), *overruled on other grounds by sub nom. State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). We also agree that a witness cannot often testify to his or her beliefs. Nevertheless, Chris Curran first testified to his belief during the State's direct examination, and the State never sought to strike Curran's conclusion on the basis of improper opinion evidence. We do not review evidentiary objections never asserted before the trial court. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). The State only objected to defense counsel's questioning Curran as to his belief on the inaccurate basis that defense counsel mischaracterized Curran's testimony.

We further note that a lay witness may testify as to his or her opinion under circumstances of personal knowledge based on rational perceptions when it would help the jury understand a fact in issue. *Pagnotta v. Beall Trailers of Oregon, Inc.*, 99 Wn. App. 28, 34, 991 P.2d 728 (2000). A witness may testify to a "belief" rationally based on perceptions. *State v. Washington*, 725 N.W.2d 125, 137 (Minn. Ct. App. 2006). Deacon Wallette was not allowed to explore whether Chris Curran's belief was based on rational observations.

12

The State argues that Deacon Wallette's counsel should have asked for a hearing, outside the hearing of the jury, to determine if Chris Curran's belief was based in part on personal knowledge. We repeat that the State never objected to the testimony based on Curran's lack of rational perceptions. Anyway, the trial court precluded further questioning on the basis that the question had already been answered, and the court directed defense counsel to move to another area of inquiry.

The State's argument overlooks Deacon Wallette's testimony of Michael Cowan changing his demeanor and pulling a knife from his pocket. The trial court's direction to defense counsel to move to another area of questioning precluded counsel from inquiring as to whether Chris Curran observed the movements of Cowan immediately before the assault by Wallette and whether Curran saw Cowan reach into a pocket. Often a police officer does not visibly spy a weapon on a civilian, yet the officer grows concerned for his or her safety when the civilian moves furtively and the officer cannot see the person's hands. Curran may have observed similar movements of Michael Cowan.

The State claims on appeal that the trial court sustained the prosecution's objection at trial to the form of the question. But that was not the State's objection. To repeat, the State claimed that Chris Curran had already answered the question.

The State also claims that Deacon Wallette was not prejudiced by the trial court's ruling. Since the preclusion of further questioning implicated Wallette's constitutional right to a fair trial, we employ constitutional error analysis. A constitutional error is

13

harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error. *State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011). This court employs the "'overwhelming untainted evidence'" test and looks to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *State v. Anderson*, 171 Wn.2d at 770 (quoting *State v. Guloy*, 104 Wn.2d at 426).

We consider Chris Curran's testimony as to a lack of a weapon to be tainted since Deacon Wallette could not inquire as to the basis of Curran's belief to the contrary. We are left with the contradictory testimony of Michael Cowan during trial and Deacon Wallette's story given to law enforcement. We never observed Cowan testify and thus lack any understanding as to his credibility. We conclude the evidence does not necessarily lead to a finding of guilt for any of the three crimes of Wallette's convictions.

The State claims that Deacon Wallette was not prejudiced by the trial court's ruling in part because trial defense counsel could have still argued that Chris Curran had a belief that Michael Cowan was armed. We already wrote that the trial court twice commented that Curran had not so testified and the State argued that counsel had mischaracterized Curran as having stating a belief of Cowan being armed. A defense counsel wishes not to countermand the comments and direction of the trial court for fear of endangering counsel's credibility before the jury.

14

First Aggressor Jury Instruction

Deacon Wallette also assigns error to the trial court's giving of a first aggressor jury instruction. Wallette argues that the evidence did not support the instruction. Since this question may reappear on remand, we address the issue even though we have already directed a new trial on other grounds. We hold that, under the facts as presented in the first trial, the trial court should not have presented the jury a first aggressor instruction. Our ruling does not preclude the trial court from delivering the first aggressor jury instruction if the facts significantly change during a second trial.

Deacon Wallette asserted the defense of self-defense. The accused cannot claim self-defense for an altercation when he initiated the fight, and thereby, the need to act in self-defense. *State v. Riley*, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999). The trial court may instruct the jury on first aggressor law when (1) the jury can reasonably determine from the evidence that the defendant provoked the fight, (2) the evidence conflicts as to whether the defendant's conduct provoked the fight, or (3) the evidence shows that the defendant made the first move by drawing a weapon. *State v. Stark*, 158 Wn. App. 952, 959, 244 P.3d 433 (2010).

First aggressor instructions negate a defendant's self-defense claim "effectively and improperly removing it from the jury's consideration." *State v. Douglas*, 128 Wn. App. 555, 563, 116 P.3d 1012 (2005). Negating the defense runs counter to the constitutional requirement that the State bears the burden of disproving self-defense

15

beyond a reasonable doubt. *State v. Riley*, 137 Wn.2d at 910 n.2. Thus, the law disfavors

first aggressor jury instructions. *State v. Kidd*, 57 Wn. App. 95, 100, 786 P.2d 847

(1990). "First aggressor instructions should be used sparingly because the other self-

defense instructions will generally be sufficient to allow the theory of the case be

argued." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS:

CRIMINAL 16.04 cmt. at 256 (4th ed. 2016); *State v. Stark*, 158 Wn. App. at 960. In fact,

few situations warrant an aggressor instruction. *State v. Wasson*, 54 Wn. App. 156, 161,

772 P.2d 1039 (1989).

To obtain a first aggressor jury instruction, the State must show a provoking act by

the defendant other than the assault itself. The provoking act that justifies a first

aggressor instruction must be one that a jury could reasonably assume would provoke a

belligerent response by the victim. *State v. Bea*, 162 Wn. App. 570, 577, 254 P.3d 948

(2011); *State v. Wasson*, 54 Wn. App. at 159. The trial court errs when it submits an

aggressor instruction and the evidence shows that the defendant used words alone to

provoke the fight. *State v. Riley*, 137 Wn.2d at 910-11 (1999); *State v. Anderson*, 144

Wn. App. 85, 89, 180 P.3d 885 (2008).

This court reviews de novo whether the State produced sufficient evidence to

justify a first aggressor instruction. *State v. Sullivan*, 196 Wn. App. 277, 289, 383 P.3d

574 (2016). When determining whether sufficient evidence supported the instruction, the

court views the evidence in the light most favorable to the party that requested the

instruction—here, the State. *State v. Wingate*, 155 Wn.2d 817, 823 n.1, 122 P.3d 908 (2005). When the record includes credible evidence from which a reasonable juror could find that the defendant provoked the need to act in self-defense, an aggressor instruction is appropriate. *State v. Riley*, 137 Wn.2d at 909-10 (1999). Nevertheless, when an inference is part of the prosecution's proof supporting an element of the crime, due process requires the presumed fact to flow more likely than not from proof of the basic fact. *State v. Hanna*, 123 Wn.2d 704, 710, 871 P.2d 135 (1994). Whether an inference meets the appropriate standard must be determined on a case-by-case basis in light of the particular evidence presented to the jury in each case. *State v. Hanna*, 123 Wn.2d at 712. A mere scintilla of evidence does not rise to the level of sufficiency in order to support a conviction. *State v. Kirkpatrick*, 14 Wn. App. 212, 216, 540 P.2d 450 (1975). Instead, the State must present substantial evidence. *State v. Randecker*, 79 Wn.2d 512, 517, 487 P.2d 1295 (1971).

The rule controlling our appeal is that the provoking act cannot be the actual assault in order to warrant the giving of the first aggressor instruction. *State v. Kidd*, 57 Wn. App. at 100 (1990); *State v. Wasson*, 54 Wn. App. at 158-59 (1989); *State v. Brower*, 43 Wn. App. 893, 902, 721 P.2d 12 (1986). Under Deacon Wallette's version of events, as related to law enforcement, he only attacked Michael Cowan after Cowan first assaulted him. Under Michael Cowan's description of the altercation, Wallette struck him without his provoking any assault. The assault constituted the first aggression.

17

Therefore, under the alternative facts heard by the jury either Deacon Wallette acted in self-defense or Wallette assaulted Cowan without provocation. Neither account warrants a first aggressor instruction.

The dissent writes that Michael Cowan displayed a knife because Deacon Wallette intruded into the home without permission. No testimony supports this factual scenario.

Christopher Curran only witnessed the actual assault. Curran did not testify to seeing any precipitating act. He only heard a precedent angry argument.

One might argue that Deacon Wallette acted as the first aggressor, under his story, when he entered Michael Cowan's residence with a machete and confronted Cowan with threatening him with a hot shot. Nevertheless, under this story, Cowan invited Wallette inside. Wallette held the right to question and complain to Cowan about seeking to kill him. Entering another's house with a weapon does not necessarily lead to violence. Wallette and Cowan could have spoken and resolved their differences. The law does not welcome a first aggressor jury instruction under these circumstances.

Law enforcement officers arm themselves with a baton, gun, and Taser. Officers frequently confront citizens even inside residences. This confrontation does not preclude an officer from asserting self-defense if a citizen attacked him or her.

### No Duty to Retreat Jury Instruction

On appeal, Deacon Wallette also assigns error to the trial court's refusal to deliver his proposed no duty to retreat jury instruction. Because this question may arise during a

18

second trial, we address the assignment of error. We hold that the trial court committed no error.

When determining whether sufficient evidence supports an instruction, the court views the evidence in the light most favorable to the party that requested the instruction—on this issue, Deacon Wallette. *State v. Wingate*, 155 Wn.2d at 823 n.1 (2005). An individual has no duty to flee a place where he or she has a right to be, however reasonable an alternative flight may be. *State v. Williams*, 81 Wn. App. 738, 743-44, 916 P.2d 445 (1996). Thus, if a reasonable jury could conclude that the defendant could have fled instead of using force, the trial court should give the jury a "no duty to retreat" instruction. *State v. Williams*, 81 Wn. App. at 744. The jury instruction need not be given when it is unnecessary to the defendant's case theory and when it would be superfluous because the issue of retreat was not raised. *State v. Wooten*, 87 Wn. App. 821, 825, 945 P.2d 1144 (1997).

The parties' dispute whether Deacon Wallette possessed the right to remain in Michael Cowan's residence and whether Cowan impliedly revoked any permission to be in the home. Nevertheless, we need not resolve this dispute. The State never argued that Wallette possessed a duty to retreat in order to rebut Wallette's self-defense theory. Wallette argues that the jury instruction was needed to counterbalance the first aggressor instruction. We have ruled that, under the facts as presented at the first trial, the trial court should not have rendered the first aggressor jury instruction. If the State argues in a

No. 34943-8-III
*State v. Wallette*

second trial that Wallette should have retreated, the trial court should revisit our ruling on the delivery of the no duty to retreat instruction.

## CONCLUSION

We reverse Deacon Wallette's convictions for first degree assault, first degree burglary and felony harassment and remand for a new trial consistent with our opinion. We do not address Deacon Wallette's assigned error of the refusal to render a fourth-degree assault jury instruction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Pennell, A.C.J.

20

No. 34943-8-III

KORSMO, J. (dissenting in part) — I agree that Deacon Wallette is entitled to a new trial because he was not allowed to question a witness to the altercation about whether or not the victim was armed. I dissent, however, from the majority's unnecessary and erroneous aggressor instruction discussion. The trial court correctly gave the aggressor instruction and, if the salient facts are the same at the retrial, should do so again.

There are two significant errors in the majority's analysis of this case. The first error is an incorrect focus on the wrong facts in assessing whether there was a basis for the instruction. The second error is to equate an old aphorism as a governing rule of law in place of actual Washington Supreme Court precedent.

We agree on the basic governing law. Self-defense is only available to respond to the *unlawful* use of force. *State v. Riley*, 137 Wn.2d 904, 911, 976 P.2d 624 (1999). Thus, one who provokes another to lawfully act in self-defense is not responding to unlawful force and has no right of self-defense. *Id.* at 909. Juries must often sort out which party, if any, was justified in using force and which was not. "Where there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-

No. 34943-8-III
*State v. Wallette*

defense, an aggressor instruction is appropriate." *Id*. at 909-910. If the evidence is in

conflict about who precipitated an encounter, the instruction is appropriate. *State v. Davis*,

119 Wn.2d 657, 665-666, 835 P.2d 1039 (1992).

As to the first problem, in order to determine if there was a basis for giving an

instruction, an appellate court must view the evidence in the light most favorable to the

party who received the instruction. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-456, 6

P.3d 1150 (2000). The majority fails to do that here. In addition, the court considers the

entire record, not simply one party's theory of the case, in determining whether there is a

factual basis to give an instruction. *Id*. at 461 (lesser included justified when supported by

substantial evidence in the record); *State v. Berlin*, 133 Wn.2d 541, 548, 947 P.2d 700

(1997) (lesser included offense available based on "evidence in the case"); *State v. Griffith*,

91 Wn.2d 572, 574-575, 589 P.2d 799 (1979) (defendant entitled to instruction if supported

by substantial evidence in the record); *State v. Adams*, 31 Wn. App. 393, 396, 641 P.2d

1207 (1982) (self-defense is based on plausible evidence in the record).

Applying these standards and viewing the evidence relating to self-defense in the

light most favorable to the State, the record shows that the defendant[1] armed himself with a

---

[1] The victim seemed to believe that Curran brought the baton to the house while
Curran testified Wallette did so. There is no question that the weapon was subsequently
wielded by Wallette.

2

collapsible baton and a machete prior to going to the victim's house to confront him about

an alleged threat and about money allegedly owed.  The two men entered the victim's

residence without permission.  Then, because the victim allegedly reached into a pocket to

pull out a knife in response to the intrusion, the defendant attacked the victim with first the

baton and then the machete.  In other words, the defendant engineered the need for the

victim to protect himself against the onset of an attack and then asserted that his planned

attack was actually self-defense because the victim pulled out his own weapon.  These facts

absolutely justified the aggressor instruction—if Wallette's actions compelled Cowan to

pull out a knife to defend himself, then Wallette's actions negated his own claim of self-

defense, and the jury rightly needed to be told how to apply self-defense in those

circumstances.

Thus, properly viewed, the evidence related to self-defense absolutely supported the

trial judge's decision to give the aggressor instruction.  However, the majority treats the

aggressor instruction as "disfavored" and wrongly looks at reasons why it should not have

been given, while disregarding inconvenient disputed facts such as whether Wallette had

permission to enter Cowan's residence.  This is not the proper evidentiary basis on which to

assess the aggressor instruction.  As noted earlier, we review whether there is an evidentiary

basis for the instruction, not whether there was evidence why it should not have been

given.[2]

The majority's concern about these irrelevant matters seems to stem from its

recognition that the case law disfavors aggressor instructions in instances where they are

not justified. The *Riley* court addressed this same problem, while reaching the opposite

conclusion to that of the majority here. There the court noted older authority from this

court suggesting that aggressor instructions are seldom necessary. *Riley*, 137 Wn.2d at

910 n.2. Nonetheless, the court noted that "an aggressor instruction *should be given*

*where called for by the evidence*," although care should be taken in giving the instruction.

*Id.* (emphasis added). In other words, the test for an aggressor instruction is found in

*Riley* and *Davis*—is there a disputed question of fact about who created the need for the

---

[2] This error in focus also finds its way into a discussion of the parties' respective theories of the case at page 17-18 of the majority opinion. There the majority notes that Cowan alleged he was the victim of an unprovoked attack, while Wallette claims he had to defend himself when Cowan responded aggressively to his efforts at discussing his concerns. From these two viewpoints of the evidence, the majority concludes that no aggressor instruction was warranted. However, a third theory of the case arose from the defendant's successful insertion of a self-defense theory—the State's obligation to disprove self-defense beyond a reasonable doubt. To that end, the analysis needed to also look to whether self-defense was disproven, so the majority's focus on the State's initial theory of the case is insufficient to resolve the problem of whether the aggressor instruction was warranted. If the State bore no burden on self-defense, then the majority's analysis would be correct. But since the State's theory of the case had to expand to account for self-defense, the majority's focus on the initial theory of assault to the exclusion of evidence of lack of self-defense does not account for the actual issue presented.

defendant's assertion of self-defense? If so, an aggressor instruction is justified. If not, then the instruction is "disfavored" because it is unnecessary and creates a significant risk of erroneously depriving the defendant of a valid claim of self-defense.

Our case law requires nothing more than this. We should not, as the majority does, go digging through the record to find reasons why the aggressor instruction should not have been given. Our analysis should focus on whether the evidence supported the giving of the instruction. Here, it did. That should be the end of the story. The trial court did not abuse its discretion in permitting the instruction.

But, instead, the majority focuses on an old aphorism instead of the governing case law. This is error in at least two ways. First, as noted in *Riley*, the aggressor instruction *should be given* when justified. It was justified in this case. The fact that there are also circumstances when the aggressor instruction should not be given does not mean that we ignore the instruction in those cases where it is justified.

Second, in promoting the "disfavored" aphorism over the actual test for determining whether the instruction is justified, the majority uses it out of context. The aggressor instruction is disfavored in those instances where it is not appropriate. An example is a case relied on by the majority, *State v. Wasson*, 54 Wn. App. 156, 772 P.2d 1039 (1989). There the defendant had revved his car engine loudly with the apparent purpose of annoying (among others) the "victim." *Id*. at 157. The victim intervened in a fight between Mr. Wasson and another man, but then engaged in a fight with the other

5

man. *Id.* When the victim then turned his attention back to Mr. Wasson and ran at him,

Wasson shot him. *Id.* This court correctly concluded that there was no evidentiary basis

for giving the aggressor instruction because Wasson's only provocative action—noisily

revving his engine—did not justify the victim's use of force against Wasson. *Id.* at 158-

159. He was not an "aggressor" as that phrase is used in our self-defense laws.[3] There is

no basis for instructing on the first aggressor when the defendant's provocative actions do

not justify the victim's own use of force.

Self-defense cases are factually distinct from each other and do not readily fall

into a "one size fits all" categorization such as the majority's characterization of the

aggressor instruction as "disfavored." In some cases the instruction will be justified, and

in others it will not be. Our focus should be whether the evidence supported the

instruction rather than on whether reviewing courts favor or disfavor the instruction at

issue. We should be disfavoring error, not an accurate and lawful instruction.

One of the ironies of this case is that the self-defense claim was exceedingly weak,

a fact that the trial court repeatedly noted while debating whether or not to give the

---

[3] A humorous example of error in giving an aggressor instruction, although the facts of the cases are tragic, is *State v. Kidd*, 57 Wn. App. 95, 786 P.2d 847 (1990). There it was error to give the aggressor instruction on two counts due to the fact that the jury should not have been given a self-defense instruction. *Id.* at 101 (finding error harmless because defendant could not have been acting in self-defense).

instruction.[4] In my experience, those are often the cases where the aggressor instruction is most often warranted simply because the relevant facts of the encounter are disputed. In cases where the facts relating to who did what to whom are not contested, there typically is no need for an aggressor instruction simply because the question of who started the fight is not in issue. When the evidence and argument simply focus on whether the use of force was justified under the circumstances, the aggressor instruction is "disfavored" because there is no need for it. It is primarily in cases like this where the claim of self-defense is tenuous that the aggressor instruction is most useful to the jury.

While I agree that the defendant is entitled to a new trial due to the error in limiting his cross-examination of the witness, I dissent from the discussion concerning the propriety of the first aggressor instruction.

_____
Korsmo, J.

---

[4] The court called the defense "tenuous" on multiple occasions before deciding to instruct on the theory, apparently because the defense had nothing else to argue. If the prosecutor had not offered the defendant's statement to the police into evidence, there would have been no reason to even consider the self-defense theory, but I am not certain that even admission of that statement satisfied the defendant's burden of self-defense.

7